### Richmond

## BOARD OF COUNTY SUPERVISORS OF HENRICO COUNTY

### V.

## THOMAS L. WILKERSON, ET AL.

September 9, 1983.

Record No. 810280.

Present: All the Justices.

*Bruce A. Kimble (William G. Broaddus, Jr., County Attorney; George T. Elmore, III, Assistant County Attorney,* on briefs), for appellant.
*David Meade White (White & Blackburn, P.C.,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

In this eminent domain case, deposits of sand and gravel lie beneath the rural land taken. The main controversy involves the extent to which evidence of such deposits may be introduced by the landowners upon the question of fair market value.

On February 4, 1980, appellant Board of Supervisors of Henrico County filed a petition for condemnation in the trial court under Code §§ 15.1-320 and 25-232 to acquire a parcel of land containing 36.4 acres for the construction of the Henrico Regional Wastewater Treatment Plant. The land was owned by appellees Thomas L. Wilkerson and Juanita P. Wilkerson, his wife, and is situated in the eastern part of the County in the Varina Magisterial District near the James River about 13 miles from Richmond.

Following a view of the property and the hearing of evidence during two days, the commissioners reported on October 1, 1980 an award of $146,838 as compensation for the land taken and $169,680 as damages to the remaining property of the landowners, for a total award of $316,518. The County filed exceptions to the report; they were overruled by the trial court in the November 1980 final order from which this appeal was taken.

The subject property was a part of approximately 198 acres of land owned by the Wilkersons. Their land was comprised of four contiguous tracts, some of which was under cultivation and some wooded. The land was acquired in two transactions. They purchased 181 acres in 1961 and added the balance in 1977. According to the testimony, the land "has been cultivated as a farm through a tenant and it has been a homeplace to raise a family." The lessee who farms on the property pays the landowners $1,500 per year.

The Wilkersons' home, a four-bedroom structure, is located on a portion of the land remaining after the take and is situated approximately 1,675 feet south of the proposed sewer facility. The evidence showed that the treatment plant is designed to have a capacity of 60 million gallons per day.

In 1969, the landowners and Sadler Materials Corporation entered into a written agreement, which was amended after the 1977 land purchase. Under the agreement, the Wilkersons granted Sadler the exclusive right to use the entire property to excavate, process, and remove sand, gravel, and stone. The term of the contract is to 1989, with a possible extension to 1994.

At the time of the hearing, Sadler had not begun to extract minerals from the property but planned to begin mining operations within three to eight years. Since the inception of the contract, often referred to as an option, the landowners have been receiving from Sadler, as prepaid compensation for the minerals, a fixed annual sum. These amounts will be credited against the price per ton of the minerals to be paid by Sadler upon extraction.

Predictably, the valuation evidence of the parties was in conflict. Richard Lee Farmer and Frank R. Whitehead, expert appraisers using the comparable sales technique, testified for the County. The landowner Thomas L. Wilkerson and Ryland J. Hughes, an expert appraiser, testified for the defendants. The following chart summarizes the evidence on value and includes the commissioners' award.

|  | Value of Whole | Value of Take | Damage to Residue |
|---|---|---|---|
| Farmer | $300,000 | $ 39,900 | $ 20,100 |
| Whitehead | $412,500 | $ 64,150 | $ 61,550 |
| Award |  | $146,838 | $169,680 |
| Hughes | $1,001,500 | $218,400 | $391,550 |
| Wilkerson | $1,443,700 | $258,440 | $500,000 |

The County's experts said the highest and best use of the property is as a "gentleman type farm" and as "estate type property." Whitehead testified there would not be "a great deal of interest in the actual production possibility of the farm," but a person "would buy it for the farm type setting and rural exposure." Both Farmer and Whitehead testified they disregarded the Sadler lease in their valuation process. Farmer said the lease encumbered the property and impaired marketability of the land. Whitehead testified the lease would have an adverse effect on value.

On behalf of the landowners, Hughes testified there were no comparable sales which involved land with as high a percentage of mineral content as the subject property. In the course of assigning

a value to the property, Hughes considered the mineral deposits and increased the valuation for that reason. In response to cross-examination by the County's attorney, Thomas Wilkerson testified that the present worth of the lease is $692,000.

Over the County's objection, the landowners presented the testimony of William E. Dvorak, Jr., a registered professional geologist, who described the nature and quantity of the minerals present under the surface of the Wilkerson property. Based on an examination and core borings of the property, he said the entire farm had 6,077,197 tons of sand and gravel. He opined the acres condemned contained 516,000 tons of the material.

On appeal, the County argues, as it did below, that evidence about the presence of sand and gravel deposits on this land should not have been received. In a pre-trial motion overruled by the trial court, the County urged that "the testimony concerning sand and gravel be excluded" because "the property is not being mined," noting it was "speculative at best, whether the property will ever be mined." On brief, the County said "the mere suggestion that sand and gravel enhances the value of the property at all involves speculation and evidence of such was improperly admitted below." We do not agree.

The general rule applicable to the measure of compensation in cases where mineral deposits exist in or on condemned property, as in other eminent domain cases, is the market value of the land. Nonetheless, the presence of mineral deposits is an element to be considered in determining such market value. The award, however, may not be fixed by separately evaluating such deposits. 4 *Nichols' Law of Eminent Domain* § 13.22, at 13-119 (rev. 3d ed. 1981); 1 L. Orgel, *Valuation Under the Law of Eminent Domain* § 165, at 672 (2d ed. 1953). *See Highway Commissioner* v. *Reynolds,* 206 Va. 785, 787, 146 S.E.2d 261, 262-63 (1966).

The foregoing general principles were applied in *Strouds Creek & M.R. Co.* v. *Herold,* 131 W.Va. 45, 45 S.E.2d 513 (1947). There, a vein of coal was located beneath the surface of the condemned land. The landowner had received an offer to lease the coal under the property, but at the time of trial no lease had been made and no mining had begun. Over objection of the condemnor, the landowners were permitted to introduce evidence of the value of the coal upon a leased or operated basis, considering the estimated amount of recoverable coal at the rates per ton provided by

mining leases under other land in the immediate area of the condemned land.

In reversing the trial court for admitting such evidence, the Supreme Court of Appeals of West Virginia said: "To establish the value of the land, the presence of crops, trees, shrubs and timber upon it and of coal, oil, gas, stone and other minerals and valuable deposits upon or under the surface may be shown." 131 W.Va. at 60, 45 S.E.2d at 523. The court further said: "Consideration, however, should be confined to the land and its contents and elements together and as an entirety when there is no separate ownership with respect to any of them." *Id.* The court held that estimates of the percentage of coal recoverable from the land, at various rates of royalty for each ton mined provided for in comparable existing leases, were inadmissible for proving the value of the land taken and damage to the residue. The court said the evidence invited speculation and conjecture since it was related to conditions which did not, in fact, exist on the condemned land and dealt with future circumstances that may or may not occur. In other words, tonnage of minerals multiplied by a unit price is an improper standard of valuation at the time of taking "because the result is based upon speculation as to the continuing existence of a theoretical future market." *United States* v. *Sowards,* 370 F.2d 87, 90 (10th Cir. 1966).

■ Applying these principles to the present case, we hold the trial court properly admitted the testimony of the geologist and the other evidence about the existence and quantity of sand and gravel on the subject property. Indeed, as the *Herold* court noted, in fixing market value in condemnation cases "consideration should be given to every element of value which ordinarily arises in negotiations between private persons with respect to the voluntary sale and purchase of property." 131 W.Va. at 60, 45 S.E.2d at 522. Certainly, private individuals bargaining about the purchase and sale of this property would not disregard the presence of minerals under the surface when arriving at a negotiated price for the land. Likewise, such factor should not be ignored by the court in setting value during eminent domain proceedings. Here, the landowners made no effort to present evidence of the unit price of the tonnage of sand and gravel in the ground and thereby separately to calculate the value of the minerals.

The County complains, however, about references to unit prices made by counsel for the landowners during cross-examination of

the County's appraiser Farmer. He had testified on redirect examination that using the entire farm for sand and gravel operations would not be its highest and best use. On recross examination, counsel for the Wilkersons proceeded to interrogate Farmer on this subject:

"Q. Since you said it wouldn't be to its highest and best use to mine it, you certainly must know the price of sand and gravel in the ground, then, don't you?

"A. I have been quoted figures of sand and gravel in the ground and lease arrangements and so forth, but I still say from the standpoint here, you have got to take on a different complexion, as you know. If you say sand and gravel, then what do you do with the home? What do you do with this? And the operations that I have seen, they go in — look at Turkey Island and others down that way where you barge right up in there. You don't have the extra burden, the economic burden of hauling out and acquiring rights of way to the place, ease of flow.

"This is where your price of gravel comes in. You are talking about economics. What is the demand? What is the supply? What is the fluctuation of the market? How easy is it to get at? Can you dig right down to it? That is the high dollar.

"But when you have got to acquire permits, licenses, rights of way to get to either the river or to other places to carry that, then the economics go right down. It is just like timber. If you have got to pull it uphill it is the same thing. If you can get timber out on level ground, fine. If you have to pull it up, it is the same thing. You are talking about economics.

"Q. So you said you did know the price of it. What is the price of sand and gravel?

"A. I said I have heard.

"Q. Tell the commission what you have heard, 20¢ a ton or 30¢ a ton?

"A. Now, are you talking about in the ground? Are you talking —

"Q. In the ground.

[Objection]

"Q. As I understood you to say on direct that using an entire farm for sand and gravel would not be to its highest and best use, yet the next thing you said you knew the price of sand and gravel by the ton, that you had heard it, and I want to know if 20¢ a ton in the ground wouldn't be a price that you have heard?

[Objection]

"Q. If you had sand and gravel priced at 20¢ a ton in the ground and 5 million tons or $1 million worth of sand and gravel, $1,800,000 — wait a minute, $1,800,000 worth of sand and gravel in the ground, wouldn't that affect the market value of the ground and make it worth more than $300,000?"

At that point, counsel for the County moved for a mistrial and the witness never answered the last question.

The County argues the trial court committed reversible error in refusing to declare a mistrial. It contends opposing counsel injected speculative, unsupported unit prices into the case, thus inviting the commission separately to evaluate the sand and gravel in the ground, contrary to the principles already discussed. The County argues the landowners "were wrongly permitted to inflate the purported value of their entire property" by counsel's statement that the sand and gravel deposits, alone, were worth $1,800,000. The County said, "[t]his figure presumably resulted from multiplying 6,000,000 tons of sand and gravel by the unit price of 30 cents per ton."

There are several reasons why the County's position must be rejected. First, the witness never answered the final question, so counsel's hypothetical query was not supported by an affirmative response. Second, landowners' counsel was testing Farmer's opinion that mining the property would not be its highest and best use. The validity and force of such an opinion would be strengthened, or weakened as the case may be, contingent on Farmer's knowledge of the mining business and the economic factors, including unit price, that affect such an enterprise. Thus, Farmer's basic knowledge of market prices was a proper subject for cross-examination testing credibility, although such information may have been improper as substantive evidence on value.

■ Third, no effort was made by the landowners, as we have said, to present evidence to calculate separately the value of the sand and gravel and relate that information to the value of the land. As a matter of fact, the commissioners were instructed explicitly, without objection by the County, concerning the treatment of mineral deposits in fixing value. Instruction 10 provided:

> "[Y]ou may not consider the existence of sand and gravel deposits on the land being taken as an element contributing to the market value of the land as a whole, unless you determine:
>
> (1) that the development of such sand and gravel deposits is consistent with the highest and best use of the property; and,
>
> (2) that there is a market for such sand and gravel in the area, and
>
> (3) that the mineral deposits are of such quantity and character that they may economically be mined taking into consideration all relevant factors; and
>
> (4) that the presence of such sand and gravel deposits on the property contributes to the market value of the property when compared with other land in the area."

This instruction is consistent with the general principles discussed earlier and with the rule followed by a number of courts that unless the development of mineral deposits is consistent with the highest and best use of the property, such deposits may not be considered as an element of damages. 4 *Nichols' Law of Eminent Domain, supra,* § 13.22, at 13-125.*

■ Finally, we likewise reject the County's other contention, which was also the subject of a pretrial motion. The County argues the court erred in permitting the commissioners to consider an award of damages to the residue. The County contends the parcel taken is not presently used in an integrated manner with the remaining parcels that make up the entire farm and that the landowners' enjoyment of the remaining parcels is not dependent upon their retaining possession of the subject property. For exam-

---

\* We need not decide today whether to embrace that rule, however, because Instruction 10 was given without objection and became the law of the case.

ple, the parcels are separated by roads and a creek, but the record shows those divisions are owned by the Wilkersons; furthermore, the roads serve the whole property. The entire farm was leased to a tenant who farmed it as a whole. The mineral lease and the amendment covered all the land owned. The County effectively has taxed the property as a whole; the 181-acre portion purchased in 1961, which includes the tract condemned, was the subject of one tax bill at the time of the hearing though the 1977 purchase was covered by another bill.

For all these reasons, and because we agree with the trial court's observation that the award was fair and reasonable under the circumstances, the judgment below will be

*Affirmed.*

RUSSELL, J., dissenting in part.

I agree with the statement of the principles of law set forth in the majority opinion concerning the proper method of valuation of mineral-bearing lands in eminent domain cases. In the circumstances of this case, however, I am of opinion that the county's motion for mistrial should have been granted.

After the view, but before the trial began, the county made a motion *in limine,* seeking to exclude all references to sand and gravel, on the ground that "the property is not being mined." Landowners' counsel responded to this motion by stating:

We are not going to introduce the number of tons of sand and gravel on this property and say what they are worth by themselves, while they are, something in excess of three quarters to a million dollars. We are not going to make that kind of introduction.

Later, in argument on the motion, counsel again stated to the court, "We are not saying that this 5,947,615 tons of gravel at 30 cents a ton is worth $1,600,000 or $1,700,000."

The court then ruled:

[T]he value of mineral deposits cannot be determined independently of the land of which it is a part. It cannot be considered as so much potential merchandise to be evaluated as such. The land has to be valued as land with the fact that

there are mineral deposits, which are given due consideration determining just compensation to be paid to the owners. It is not proper to aggregate the value of the deposit.

[Landowners' counsel]: Right.

The court continued with an explanation of the ruling, adding:

In other words, no separate evaluation of the sand and gravel as such, . . . only the fair market value of the land considering the fact that there are whatever quantities of it available.

Against this background, landowners' counsel, in the presence of the commissioners and in the guise of "testing Farmer's opinion that mining the property would not be its highest and best use," injected into the case the amount of gravel allegedly in the ground (5 million tons), the alleged unit value of unmined gravel (20 cents or 30 cents per ton), and a resultant value of $1,800,000 (which was itself a mathematical error of $300,000 in his client's favor).

Even worse than the foregoing, because of the court's ruling, the commissioners had no evidence before them as to a unit value of unmined gravel until counsel provided it by his "question" and the figures counsel provided did not conform to the available evidence. Had evidence of the unit value of unmined sand and gravel been admissible, it would have shown that the landowners' entire property was encumbered by a lease and option giving Sadler Materials Corporation the right to remove all of the sand and gravel it desired, until 1994, for a graduated scale of prices alternating between 10 cents and 15 cents per ton, half the amounts mentioned by counsel.

In order to correct the injustice resulting from counsel's misstatement of the value of the sand and gravel in place, in lieu of granting a mistrial, the court ruled that the county might introduce the Sadler lease in evidence. The county expressed reluctance to do so, in view of the court's ruling on the motion *in limine,* and stood on its motion for mistrial. When this motion was denied, the county introduced the lease. Landowners' counsel was then permitted, over the county's objection, to introduce the testimony of a geologist as to the estimated tonnage of gravel in the ground, as well as the opinion of Sadler's vice-president that his

firm planned to mine the gravel in the future. Thus, the breach in the court's ruling, created by counsel's "question," was widened into a gulf.

It is axiomatic that counsel should not testify as a witness for his client. *See* Virginia Code of Professional Responsibility, DR 5-101(B) and 5-102, 216 Va. 1101-02. *A fortiori,* he should not make unsworn statements as to facts outside the evidence. *Power Company* v. *Jayne,* 151 Va. 694, 703-05, 144 S.E. 638, 641 (1928). Putting such statements before the trier of fact in the form of a "question" does nothing to legitimize them. *See Thurpin* v. *Commonwealth,* 147 Va. 709, 713-14, 137 S.E. 528, 529-30 (1927).

For these reasons, I cannot subscribe to the view, twice stated in the majority opinion, that "no effort was made by the landowners to present evidence to calculate separately the value of the sand and gravel and relate that information to the value of the land." I think the landowners did just that, notwithstanding their earlier statements of intention, and despite the rulings of the court. Although the court ultimately gave an instruction to the commissioners which correctly stated the applicable law, in the circumstances of this case the only adequate remedy for the harm done to the county would have been to grant its motion for a mistrial.