EAST TENNESSEE NATURAL GAS COMPANY

V.

COWAN R. RINER

Record No. 880035

January 12, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Lacy, JJ., and Cochran, Retired Justice

*Stephen M. Hodges (Buddy H. Wallen; Penn, Stuart, Eskridge & Jones*, on briefs), for appellant.
*Scott W. Mullins (Frank Kilgore*, on brief), for appellee.

JUSTICE RUSSELL delivered the opinion of the Court.

In this eminent domain proceeding, we must determine whether the landowner, who owned the surface of the land but not the underlying mineral rights, was entitled to an award of damages to his residue property based upon the lost value of potential future strip mining.

East Tennessee Natural Gas Company (the condemnor), representing that it was a public service corporation clothed with the power of eminent domain, filed a petition for condemnation seeking to acquire a permanent right of way over the lands of Cowan R. Riner (the landowner) in Dickenson County. The easement was to enable the condemnor to construct and maintain two pipelines for the transportation of liquids and gases.

The landowner's property consisted of a 91-acre mountaintop tract on Sandy Ridge, where he had lived and farmed continuously since 1916. Two seams of coal ran through the property, and the landowner had, "way back," dug some coal from outcroppings for his own use as "house coal." He still retains the right to make personal use of surface coal. All other rights to the coal, however, were sold many years ago. The owner of the mineral rights at the time of taking was the Norton Coal Company, which was not made a party to the condemnation proceeding.

An expert witness for the landowner testified that, although the property was currently used as hay and pasture land, its highest and best use was for strip mining; "[i]t's a perfect strip job." The coal lay close to the surface and drift, or deep, mining was impracticable due to insufficient "cover." The owner of the mineral rights, however, would be unable to strip mine the property unless he acquired the surface, or the right to disturb the surface, from the landowner. The owner of the mineral rights had made no effort to acquire the surface rights and had expressed no interest in mining the property.

Strip mining had been carried out on other properties on Sandy Ridge, but the landowner's witness testified that the economic state of the mining industry in Southwest Virginia at the time of taking was "very poor." During a "coal boom" in that area in the

1970's, the landowner had received an inquiry concerning the possibility of drift mining his property, but no interest in strip mining had been expressed to him at any time.

An expert witness for the landowner testified that the condemnor's project would preclude any strip mining on the landowner's residue property. He gave two reasons for this opinion: first, the proposed pipeline would run between the two seams of coal, and within 100 feet of each of them. Strip mining would require extensive blasting, and blasting would be prohibited by law within 100 feet of the pipeline. Second, the only practicable way to remove strip-mined coal from the tract would be by the use of 50-ton haulers which would have to cross the pipeline, inevitably damaging it. Thus, the landowner's position was that the taking changed the highest and best use of the residue property from strip mining to agricultural uses.

An appraiser testified for the landowner, over the condemnor's objection, that the fair market value of the residue property, at the time of taking, was $100,000 for strip mining use, but only $38,600 for agricultural uses. The condemnor introduced the testimony of an appraiser who opined that the fair market value of the easement taken was $728, and that the damages to the residue would amount to $3,000.

The condemnor offered an instruction which would have told the commissioners that they were not to consider coal, mineral rights, or surface rights to mine coal, as an element contributing to the market value of the landowner's property. The court refused the instruction. The commissioners returned an award of $728 for the easement taken and $35,000 for damages to the residue, on which the court entered judgment. We granted the condemnor an appeal, limited to the question whether the court erred in admitting evidence of the value of the property as a strip-mining site and in permitting the commissioners to consider such a prospective use as an element of fair market value.

■■■ Where mineral deposits exist in condemned property, the measure of compensation is, as in other eminent domain cases, the fair market value of the property, and the presence of mineral deposits is an element of value to be considered. *Henrico County* v. *Wilkerson*, 226 Va. 84, 88, 307 S.E.2d 450, 452 (1983). Nevertheless, the separate value of the mineral deposits themselves, and the future rents and royalties that would be received for them when and if they are removed from the land, are inadmissible for

proving either the value of the property taken or damage to the residue. *Id*. at 89, 307 S.E.2d at 452. The reason for that rule is that such evidence invites speculation and conjecture, because it relates to "conditions which did not, in fact, exist on the condemned land and . . . future circumstances that may or may not occur." *Id*.

■ In *State Hwy. & Transp. Comm'r. v. Lanier Farm*, 233 Va. 506, 510, 357 S.E.2d 531, 533 (1987), we held that, ordinarily, frustration of the owner's plans for development or future use of the property is not in itself a compensable item of damages. There, we quoted *Richmond & P.R. Co. v. Seaboard &c., Co.*, 103 Va. 399, 407, 49 S.E. 512, 515 (1905): "It is the present actual value of the land with all its adaptations to general and special uses, and not its prospective, or speculative, or possible value based upon future expenditures and improvements that is to be considered." *Id*.

■ In *Henrico County v. Wilkerson*, the owners of the condemned property had title to both the surface of the land and to the underlying deposits of sand and gravel. The owners had, however, leased to another party the exclusive right to excavate and remove the deposits. The lease, which was subject to extension for many years, required a fixed annual payment to the owners before mining operations began, to be credited against stipulated per-ton royalties which would be payable as mining proceeded. At the time of taking, mining had not yet begun, but the lessee intended to commence operations within three to eight years. *Id*. at 86-87, 307 S.E.2d at 451. Thus, a party negotiating the purchase of all the owner's holdings would necessarily contemplate acquisition of the income stream presently produced by the mineral lease as well as the prospect of future royalties. The owner was entitled to both of those rights, and they would necessarily be reflected in the market value of the entire property before the taking. *Id*. at 89, 307 S.E.2d at 453.

■ In *Wilkerson*, we did not approve the introduction of evidence calculating the value of the mineral deposits separately from the land. We did, however, approve the following instruction granted by the trial court:

[Y]ou may not consider the existence of sand and gravel deposits on the land being taken as an element contributing to

the market value of the land as a whole, unless you determine:

(1) that the development of such sand and gravel deposits is consistent with the highest and best use of the property; and,

(2) that there is a market for such sand and gravel in the area, and

(3) that the mineral deposits are of such quantity and character that they may economically be mined taking into consideration all relevant factors; and

(4) that the presence of such sand and gravel deposits on the property contributes to the market value of the property when compared with other land in the area.

*Wilkerson*, 226 Va. at 92, 307 S.E.2d at 454.

█ The above-quoted instruction states the principles which control the present case. The record here does not support the prerequisites which the commissioners must find in order to justify consideration of the existence of mineral deposits as an element of market value. Here, in contrast to *Wilkerson*, the landowner had no present or future rights to the coal, or to any royalties or other benefits the coal might ever produce. A private party negotiating a purchase of the landowner's interest could expect no advantage from the existence of the minerals in the ground. Thus, the fourth condition in the above-quoted instruction is not met. The second and third conditions also fail because there is no evidence that a market existed for the coal in the landowner's area at the time of taking, or that mining would be economically successful, taking all relevant factors into consideration. Indeed, the evidence was to the contrary.

█ It is true, as the landowner argues, that he would have the right to prevent the owner of the mineral rights from disturbing the surface, and that a sale of this right would have to be negotiated before strip mining could begin, but there was no evidence that there was any market for such a sale at the time of taking. Therefore, the evidence in the present case would not have supported the granting of the *Wilkerson* instruction, and the evidence of the value of the property as a strip-mining site was based upon conjecture and speculation. It was "related to conditions which did not, in fact, exist" and it "dealt with future circumstances

that may or may not occur." *See Wilkerson*, 226 Va. at 89, 307 S.E.2d at 452.

 In every eminent domain case involving a partial taking, the measure of damages to the residue of the property not taken is the difference in the fair market value of the residue immediately before and immediately after the taking. In ascertaining such damages, both present and future circumstances which actually affect the value of the property at the time of taking may be considered, but remote and speculative damages may not be allowed. *Colonial Pipeline* v. *Lohman*, 207 Va. 775, 781, 152 S.E.2d 34, 39 (1967); *Ryan* v. *Davis*, 201 Va. 79, 82, 109 S.E.2d 409, 412 (1959); *Appalachian Elec. Etc., Co.* v. *Gorman*, 191 Va. 344, 353, 61 S.E.2d 33, 37 (1950). In the present case, because there was no competent evidence that the prospect of future strip mining had any effect upon the value of the landowner's interest in the residue property immediately before the taking, the court should have sustained the condemnor's objection to the landowner's opinion evidence based upon that premise, and instructed the commissioners to disregard it.

Because the correctness of the award of compensation for the easement taken is undisputed, we will affirm the judgment to that extent. For the reasons stated above, we will reverse the award of damages to the residue property and remand the case for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*