694

## Richmond.

### Virginia Electric and Power Company v. Walter P. Jayne.

September 27, 1928.

The opinion states the case.

*T. Justin Moore, A. G. Robertson* and *Richard H. Mann*, for the plaintiff in error.

*Wendenburg & Haddon, Leith S. Bremner* and *M. A. Cogbill*, for the defendant in error.

McLemore, J., delivered the opinion of the court.

From the Circuit Court of Chesterfield county, wherein there was a verdict and judgment against the plaintiff in error, Virginia Electric and Power Company, upon whose petition a writ of error has been granted.

The parties will be here referred to as they were designated in the trial court.

The defendant has for a long period of years owned and operated an electric railway line between Petersburg and Richmond, and was so operating on July 19, 1925. There is also connecting the two cities a concrete turnpike or highway, which for the purposes of

this case parallels the railway line and is situated on the east side thereof, the western edge of the concrete highway being sixteen and one-half feet from the eastern rail of the defendant's track, both of which run approximately north and south.

The railway company occupies its own private right-of-way, which is only used by the traveling public at well defined street or road crossings.

On July 19, 1925, at about 6:20 p. m., plaintiff in a Ford roadster, accompanied by a negro woman, approached from the west the railway track and crossed the same to the concrete turnpike on the east at what is known as Brander's bridge road crossing. This crossing is about two miles north of Petersburg, and 507 feet north of Naple avenue which runs east and west and also crosses the track of the defendant company. The automobile, after crossing the railway track at Brander's bridge crossing, proceeded along the concrete highway towards Petersburg until it reached Maple avenue, when plaintiff riding therein attempted to recross the tracks of the railway, was in collision with one of defendant's cars going south, and the driver was seriously injured.

This is a bare outline of the uncontroverted facts. Plaintiff says he saw the car coming when he first crossed the track at Brander's bridge crossing, at which time it was three quarters to seven-eights of a mile away; that he turned south on the turnpike which placed the street car in his rear and approached Maple avenue at the rate of ten miles per hour; that before making the turn into Maple avenue he looked back and the car was then 100 to 150 feet north of Brander's bridge road, which is 507 feet north of Maple avenue; that the railroad is straight from the point of the accident north more than half a mile;

that the distance from the concrete where it crosses
the avenue to the east rail of the car line is sixteen and
one-half feet; that as he approached Maple avenue,
having decided to recross the defendant's track at this
point: "I put my hand out and made my turn around
going at the rate of just about ten miles an hour.
Q. Before you started to make that turn did you
look back to see where the car was? If so, where was
the car? A. Yes, sir. The car was every bit of
100 to 150 feet; I don't know the exact distance,
but it was beyond the diamond shape sign that is
placed up there right on the side of the car line. That
car was quite a little ways beyond that. Q. Is that
north of the Brander's bridge road? A. Yes, sir. I
couldn't say accurately just how far it was, but it was
quite a distance beyond the Brander's bridge road."
That as he ran upon the track his car stalled; that he
leaned down to adjust his brake, and looked up the
track about the same time, when the street car was
only 100 to |125 feet from him, and the crash came
before he could lift his head.

The brakeman, Barrett, is uncontradicted when he
says he saw the plaintiff when he made his turn to
cross the track from the concrete highway, and that he
immediately "threw the car in emergency brakes and
reversed;" and that he can bring his car to a stop in
about two and one-half car lengths (114 feet) when
running at twenty-five miles per hour.

One of the plaintiff's witnesses says the car was
running thirty-five to forty miles per hour when it
past him beyond the Brander's bridge road.

The record presents six assignments of error, the
first of which is as follows:

"The court erred in overruling your petitioner's
motion to set aside the verdict of the jury and enter

judgment for the defendant on the ground that the verdict is contrary to the evidence and without evidence to support it, and if said motion be denied, to set aside the verdict of the jury and grant the defendant a new trial, on the grounds stated in said motion."

This assignment presents the question of whether or not the case has been fairly submitted to the jury, and if so does the evidence justify the verdict and judgment.

Plaintiff's counsel in his brief says:

"The case of *Southern Railway Co.* v. *Jones*, 106 Va. 412, 56 S. E. 155, quoted in the petition, is also not in point, because there also was a failure to look and listen. When the plaintiff saw the car, at a point he could have crossed in safety, it was not his duty to keep his eyes on the car all the time until he crossed in safety, for such a requirement would lead to accidents with other approaching vehicles. In the instant case, it is apparent that no act of the plaintiff placed him in the position of peril he was in at the time of the collision, and the proximate cause of this position of peril was the unforeseen, unexpected and unavoidable stalling of the engine, which caused the plaintiff to become helpless, and, therefore, he was not guilty of contributory nor concurrent negligence."

If we accept this theory of the case, then the question arises as to whether the defendant's servant, after plaintiff's peril became apparent, had a *clear chance* to avoid the collision. In considering the case from this angle, we assume that plaintiff had ample time to have crossed the track in safety but for the stalling of the car. The motorman must also have known that no danger was to be expected by reason of the car crossing the track, until it had actually stalled. Plaintiff testified that:

"A. Just as soon as I found the engine had stopped

(I was driving a Ford roadster, and every one who is familiar with a Ford car knows how most people start them in regard to their brakes), I leaned down to hold it down; when the car had stalled, the brake flew up a little bit, and I leaned down. When I did, that was the first intimation I had that the car was bearing down upon me.

"Q. When you first saw the car bearing down on you how far was it off from you?

"A. I suppose 100 or 125 feet.

"Q. What was the motorman doing?

"A. All I saw was the side of his face. He was looking out into the turnpike. I didn't think he had seen me.

"Q. How long after that was it when the crash came?

"A. It didn't give me time to raise my head. My head was on the wheel leaning down, and before I could get it up the crash came; that ended it, I didn't know anything more."

From the plaintiff's picture of the accident it is quite apparent that the stopping of the engine, the plaintiff's attempt to start it, and the sight of the street car from 100 to 125 feet away, were acts of such rapid sequence as to leave no appreciable interval of time between them. If the car was traveling thirty miles per hour, the distance to the stalled car would have been covered in about three seconds, and if going at the rate of forty miles as claimed by plaintiff's witness it would have reached the automobile in about two seconds, after it was discovered by the plaintiff.

■ Until he discovered, or in the exercise of ordinary care should have seen, the perilous condition of the car, the motorman had no reason to suspect or anticipate a situation which rendered an accident inevitable, or even probable, and was therefore under no duty to reduce the speed of his car.

■ The burden is on the party relying upon the doctrine of last clear chance to prove it by affirmative evidence, as was said in *Ashby* v. *Virginia Railway and Power Co.*, 138 Va. 310, 122 S. E. 104:

"One relying upon the doctrine of last clear chance has the burden of proving affirmatively, by a preponderance of evidence, that by the use of ordinary care, after his peril was discovered, there was in fact a last clear chance to save him." *Shuster* v. *Virginia Railway and Power Co.*, 144 Va. 387, 132 S. E. 185; *Norfolk Southern Railroad Company* v. *Smith*, 122 Va. 302, 94 S. E. 789; *Real Estate Trust and Insurance Co.* v. *Gwyn's Adm'r*, 113 Va. 337, 74 S. E. 208; *Norfolk Southern Railroad Company* v. *White's Adm'r*, 117 Va. 342, 84 S. E. 646.

■ The evidence of the plaintiff as to how the accident happened is indefinite, uncertain and inconclusive. The court is left to guess where the street car was when the plaintiff's car stalled on the track. If he was only 100 or 150 feet from the avenue, then it is perfectly clear that he did not have a clear chance to stop his car in time to avoid the collision. The plaintiff has failed to carry the burden which he must assume when he relies upon the last clear chance doctrine. *Ashby* v. *Virginia Railway and Power Company, supra.*

The motorman's testimony, uncontradicted, is that he saw the automobile as it took "a short cut into Maple avenue * * * * * * I rapped down on my foot gong, threw the car in emergency brakes and reversed."

As the evidence appears from the record before us a verdict should have been returned in favor of the defendant, and the jury failing to do so, its finding should

have been set aside and judgment entered for the defendant in the trial court.

There was exception taken by the defendant to the court's action in permitting evidence to show that the car of plaintiff "went dead" on defendant's track, when the notice of motion alleged that the two conveyances were in continuous movement until the collision occurred.

While it might easily happen that a defendant would be prejudiced by allowing evidence to go before the jury tending to establish a different case from that set up in the pleadings; this seems not to have occurred here, and we think the court rightly proceeded with the trial.

In the trial of cases of this character counsel usually have available all the evidence that diligence has been able to discover tending to throw light even remotely on the happening of the accident. If during the progress of the trial, or at its close, it becomes apparent that the ruling of defendant into trial over his protest has worked an injustice, the court has ample power to grant the requisite relief.

Errors are assigned because the court added to the defendant's instructions the last clear chance doctrine.

We think the evidence did not support the doctrine, and therefore no instruction embodying this idea should have been given. We see no objection, however, to the addenda had the testimony been sufficient to support a verdict. The doctrine recognizes the continuous negligence of the plaintiff, but also gives expression to that higher law of humanity which forbids the infliction of injury upon a fellow being if it can be safely avoided after his peril has become apparent, and this is so, however negligent the plaintiff may be.

■ The sixth assignment of error is based upon the refusal of the court to order a mistrial because of remarks made by plaintiff's counsel in the argument of the case before the jury. The language complained of is: "How long will the defendant company shed its tears after this trial is over? Do you suppose its tear duct has been hurt any?" These remarks the court directed the jury to disregard, and counsel then stated: "That is just a figure of speech. You know corporations haven't any tear ducts." And this last statement in the presence of the jury they were also told by the court to disregard.

To prescribe hard and fast limits beyond which counsel must not roam in the argument of controversies before juries, would perhaps destroy that flexibility in the conduct of cases before them which is recognized as legitimate and helpful, and by reason of which they are the better able to understand and apply the law and the facts to the case under consideration.

On the other hand, there are frequent instances where counsel, for one cause or another, inject into the trial of a case observations with no other foundation or basis than the ingenuity of their own minds, the effect of which is to inflame the prejudices, passions or sympathies of the jurors, and thereby secure verdicts based upon the theory that the defendant be penalized, rather than that the plaintiff be compensated.

We think the observations of plaintiff's counsel were without evidence to support them; were improper and prejudicial. While the court instructed the jury to disregard the objectionable statements, it cannot be successfully contended that this does more than to theoretically cure the wrong, leaving the defendant to writhe under the unjustified imputations before the jury, and frequently an increased verdict, the probable result of an argument disapproved by the court.

Litigants can have no just grounds for complaint if verdicts obtained under such circumstances are set aside. To require counsel to confine their discussions before the jury to the law and the evidence is no hardship, but is in furtherance of justice, and of the prompt disposition of controversies based upon the law and the evidence, subjected of course to any fair analysis or criticism, which the ingenuity of counsel may devise.

Unfortunately, the courts in recent years have been called upon frequently to consider this evil. No rule can be prescribed which will meet the varying facts that may arise in the conduct of jury trials. Perhaps in no case have the principles that should control been more clearly and comprehensively stated than by Prentis, P., in *Atlantic Coast Realty Co.* v. *Robertson's Ex'r, et als.*, 135 Va. 247, 116 S. E. 476: •

■ "While it is undoubtedly true that an attorney must be always faithful to the interest of his clients and fearless in his advocacy of their rights, it is likewise true that he must be just to opposing litigants and witnesses, and always respect their rights. His liberties in argument are large but they are not unlimited. He has no right to testify in argument nor to assume that there is evidence which has no existence, nor to urge a decision which is favorable to his client by arousing sympathy, exciting prejudice, or upon any ground which is illegal. Sometimes the impropriety is so serious in character that its evil effect cannot be corrected by the trial judge. If this ethical rule which usually actuates lawyers of the highest type in the conduct of litigation is not sufficient to control those who fail to observe it, the courts, however reluctant they may be to limit the freedom of discussions, or to penalize a litigant for the transgression of his attorney, will be forced to curb this growing evil." *Norfolk Southern Railroad Co.*

v. *Tomlinson*, 116 Va. 165, 81 S. E. 89; *Norfolk and Western Railway Co.* v. *Allen*, 122 Va. 617, 95 S. E. 410; *Lorillard Company* v. *Clay*, 127 Va. 734, 104 S. E. 384.

In the case of *Norfolk and Western Railway Company* v. *Allen, supra,* Burks, J., says:

"This court has more than once reprobated in no uncertain terms the practice of injecting into arguments of counsel statements calculated to inflame the minds of the jurors, and tending to produce verdicts as a result of prejudice rather than a calm consideration of the evidence. Every litigant, natural or artificial, is entitled to a fair and impartial trial, and there should be excluded from the tribunal which is to try the case, whether judge or jury, every thing that has no tendency to aid such tribunal in doing impartial justice between the litigants. There can be no difference of opinion on this subject."

Upon the merits of the case we are of opinion that the plaintiff has failed to show that his injury was the result of defendant's negligence, and the judgment in favor of the plaintiff will be set aside and verdict entered in this court for the defendant.

*Judgment reversed.*