# Ellis F. Maxey, M.D.

## AND

# Charlotte M. Wild, M.D.

## V.

# Barbara B. Hubble

Record Nos. 880908 and 880915

November 10, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas,* Whiting, and Lacy, JJ.

---

* Justice Thomas participated in the hearing and decision of this case prior to the effective date of his resignation, November 1, 1989.

608

*Thomas J. Harlan; Elizabeth H. Esinhart (Martha E. Withrow; Willcox & Savage*, on briefs), for appellants.
*Robert W. Mann (Young, Haskins, Mann & Gregory* on brief), for appellee.

Justice Russell delivered the opinion of the Court.

This is an appeal from a judgment in favor of the plaintiff in a medical malpractice case. The dispositive question is whether the conduct of plaintiff's counsel was so calculated to inflame and prejudice the jury as to preclude a fair trial. We conclude that it was, and reverse.

Barbara B. Hubble was a patient of Dr. Ellis F. Maxey, an ophthalmologist. On January 23, 1984, Dr. Maxey performed an operation on Mrs. Hubble's right eye, removing a cataract and implanting an intraocular lens. The operation was performed in Riverside Hospital in Newport News, where Dr. Charlotte M. Wild practiced as an anesthesiologist. While administering general anesthesia to Mrs. Hubble, Dr. Wild had difficulty inserting an endotracheal tube. She succeeded on her fifth attempt. She told Dr. Maxey that Mrs. Hubble would have a sore throat as a result of the trauma caused by the intubation.

Mrs. Hubble was discharged from the hospital the following day. She complained of a sore throat for the next six days, after which she consulted Dr. William R. Steffey, an otolaryngologist. Dr. Steffey readmitted Mrs. Hubble to Riverside Hospital on January 30 for a laryngoscopy. She was found to have a perforation of the cervical esophagus, a very dangerous condition frequently fatal within 24 to 48 hours of its onset. A team of thoracic surgeons, Dr. Charles E. Umstott and Dr. Walter H. Graham, performed successful surgery, but Mrs. Hubble's condition was grave and she was not released from the hospital until February 22, 1984.

In 1986, Mrs. Hubble brought this malpractice action against Drs. Maxey and Wild. The plaintiff's position was that the endotracheal intubation was negligently performed, perforating the esophagus. The defendants contended that such a result would have caused death within 48 hours of the operation. Their position was that due to the unusual alignment of Mrs. Hubble's trachea, some trauma during intubation was unavoidable, and probably caused a laceration in the lining of the esophagus, which would

not have violated the standard of care. Such lacerations are not uncommon and rarely evolve into the serious complications Mrs. Hubble experienced. Because of this disagreement, the trial became a two-week battle of experts.

Before trial, a dispute arose between counsel with regard to the propriety of interviewing an opponent's prospective expert witnesses. The question was complicated because some treating physicians were also to be called as experts, some experts had previously treated the plaintiff, some physicians were to be "fact witnesses" only, and some were to be experts in a limited sense, omitting any testimony as to the standard of care. The court ruled that physicians who had not treated the plaintiff, but who were to testify only as expert witnesses, could not be interviewed by opposing counsel. On the other hand, the court ruled that any physician who had treated the plaintiff was available to either side for interview and discovery.

Defense counsel named Dr. Steffey, the otolaryngologist, and Drs. Umstott and Graham, the thoracic surgeons, as prospective expert witnesses. Because these physicians also had treated Mrs. Hubble, plaintiff's counsel moved the court to order defense counsel to refrain from any *ex parte* communications with them. The court overruled the motion, reiterating its holding that "fact" witnesses were available for interview by all parties.

Notwithstanding that ruling, Gwen Schockemoehl, one of plaintiff's counsel** thereafter wrote letters to Drs. Steffey, Umstott, and Graham advising them that "some courts have considered the rendering of expert opinions by treating doctors . . . as a breach of the fiduciary relationship which exists between doctor and patient." The letter ended by asking the doctors to "refrain from discussing your care and treatment of her with unauthorized persons." Defense counsel sent a copy of the letter to the court, without comment. The court responded with a letter to all counsel reiterating the previous ruling, and indicating that action with respect to Mrs. Schockemoehl's letter would be deferred until a later stage of the case.

On the opening day of trial, plaintiff's counsel made a motion *in limine* to preclude the defendants from calling as witnesses any of the physicians who had treated the plaintiff, stating that this

** The plaintiff was represented at trial by Edward W. Taylor and Gwen M. Schockemoehl. During the pendency of this appeal, they withdrew and Robert W. Mann entered his appearance for Mrs. Hubble.

would be a "violation of the physician/patient privilege." The court held that this was covered by its original ruling, and that the court had been "shocked" by Mrs. Schockemoehl's letter. Nevertheless, Mr. Taylor proceeded to cross-examine Dr. Steffey as follows:

Q. Well, did Dr. Maxey's lawyers — did you talk with Dr. Maxey's lawyers about what your opinion was going to be in this case?

A. Yes.

Q. How many times have you talked with Dr. Maxey's lawyers?

A. I think on two occasions.

Q. Barbara Hubble is your patient, isn't she?

A. Yes.

Q. Wasn't she your patient on January 30 and 31?

A. Yes.

Q. And you treated her in the hospital?

A. That's correct.

Q. Your relationship to Barbara Hubble, was it not, was as a patient?

MR. HARLAN: Your Honor please, I think this has been the subject of comment before by counsel and the Court, and I'd ask the Court to recollect —

THE COURT: Yes, I've ruled on this, now. I don't mind you asking him whether he had treated her, but let's don't get into any ethical standards.

Mr. Taylor was undeterred. His interrogation immediately continued:

Q. You have medical ethics, though, don't you?

A. Yes.

Q. In your profession?

A. Yes.

MR. HARLAN: Your Honor please, you just instructed Mr. Taylor —

THE COURT: Yes, but I have ruled, ladies and gentlemen, that he has violated no ethical standards in talking with the defendant's lawyers.

Later, in recross-examination of Dr. Steffey, Mr. Taylor persisted:

Q. And you have met with Dr. Wild's lawyers, have you not?

A. Yes.

Q. How many occasions have you met with Dr. Wild's lawyers?

A. Three, I believe.

Q. Did you have any kind of a — did you ask Barbara Hubble if that would be okay with her?

MR. HARLAN: Objection, Your Honor. That's not necessary.

THE COURT: Sustained.

BY MR. TAYLOR:

Q. Did you have a medical authorization from Barbara Hubble?

MR. HARLAN: Objection, Your Honor.

THE COURT: Sustained.

MR. HARLAN: And I move for a mistrial.

THE COURT: All right, I'll overrule your motion on that.

Plaintiff's counsel, from opening statement through closing argument, attempted to portray the defense as a part of a conspiracy among members of the medical profession. In opening statement, plaintiff's counsel said:

[S]he's had what we submit to you as a devil of a time going from doctor to doctor here in this area . . . trying to get help. She has been to two or three eye doctors in this area and found out, she will tell you, that they had been working for Dr. Maxey in this lawsuit on the side. . . .

Plaintiff's counsel also told the jury about two other physicians Mrs. Hubble had consulted who, unknown to her, had secretly been "working for the other side."

Out of the hearing of the jury, defense counsel complained to the court. Plaintiff's counsel responded with remarkable frankness: "There is nothing wrong with trying to convey a conspiracy idea when everyone in the United States knows there is a conspiracy of silence, especially in a tight-knit opthalmology community . . . ." The court responded, "[T]he box you are trying to put me in is for this jury to get across that there is insurance involved in this case, . . . . [W]hy we can't just try a straightforward case, I don't know, unless you are trying to engender sympathy, or trying to get insurance in it indirectly, or trying to show a conspiracy indirectly, and I'm not going to have it." The court, however, again denied defense counsel's motion for a mistrial.

Notwithstanding the court's admonitions, the conspiracy theme recurred persistently. In summation, Mr. Taylor argued to the jury:

Now, you might ask yourself, why didn't we get somebody here in Newport News to testify? Well, you know, physicians tend to close ranks in this type of situation, especially when they are all working together under the same circumstances. And I'm not being critical of any of the local physicians. They find themselves between a rock and a hard place in a situation like this. They have to work every day with Dr. Maxey and Dr. Wild.

. . .

And these doctors are all under the gun in that type of situation, and they don't come forth to volunteer to help the patient.

After a brief period of deliberation the jury returned a verdict for the plaintiff in the amount of $500,000, the exact amount claimed. The court denied the defendant's motion to set aside the verdict and grant a new trial and entered judgment on the verdict. We granted the defendants an appeal.

▇ In *A.C.R. Co.* v. *Robertson's Ex'r.*, 135 Va. 247, 263, 116 S.E. 476, 481 (1923), we said:

> [An attorney] must be just to opposing litigants and witnesses and always respect their rights. His liberties in argument are large but they are not unlimited. He has no right to testify in argument nor to assume that there is evidence which has no existence, nor to urge a decision which is favorable to his client by arousing sympathy, exciting prejudice, or upon any ground which is illegal. Sometimes the impropriety is so serious in character that its evil effect cannot be corrected by the trial judge. If this ethical rule . . . is not sufficient to control those who fail to observe it, the courts, however reluctant they may be to limit the freedom of discussion, or to penalize a litigant for the transgression of his attorney, will be forced to curb this growing evil.

▇ In that case, we decided that the trial court's prompt action to correct the improper effect of counsel's remarks was sufficient to avert the danger of prejudice, *id*. at 262-63, 116 S.E at 481, and affirmed the judgment. But only eight months later, we were called upon to decide a case in which plaintiff's counsel had persisted in alluding to casualty insurance in a tort case after the trial judge had admonished counsel, instructed the jury in the strongest terms to disregard the improper remarks, and received the jury's assurance that it understood the court's instructions and would abide by them. In that case, *Rinehart & Dennis Co.* v. *Brown*, 137 Va. 670, 120 S.E. 269 (1923), we said:

> Generally a new trial will be denied where improper argument has been checked by the court and the jury has been instructed to disregard the improper statements. *If, however, counsel persists in such argument after the admonition of*

*the court*, or if it appears that the unfavorable influence of the argument was probably not wholly removed by the court's action, a new trial may be allowed.

*Id*. at 676, 120 S.E. at 271 (citing *Wash. & O.D. Co.* v. *Ward*, 119 Va. 334, 339, 89 S.E. 140, 142 (1916)) (emphasis added). Because of counsel's persistence after the trial court's admonition, we held in *Rinehart & Dennis Co.* that a new trial should have been granted, and reversed.

Counsel's persistence in a course of conduct which the trial judge had disapproved and instructed the jury to disregard was alone sufficient to require reversal of a judgment in favor of the offending counsel's client in *Power Company* v. *Jayne*, 151 Va. 694, 144 S.E. 638 (1928). There, plaintiff's counsel said in argument, "How long will the defendant company shed its tears after this trial is over? Do you suppose its tear duct has been hurt any?" The court directed the jury to disregard those remarks. Plaintiff's counsel then said, "That is just a figure of speech. You know corporations haven't any tear ducts." *Id*. at 703, 144 S.E. at 641. The court instructed the jury to disregard that remark as well, but the result was a reversal on appeal and the grant of a new trial. *Id*. at 705, 144 S.E. at 641.

In *N. & W. Ry. Co.* v. *Eley*, 152 Va. 773, 148 S.E. 678 (1929), we reversed a judgment for a plaintiff in a case in which the plaintiff's attorney had argued to the jury that testimony of the engineer and fireman of the defendant railroad should be disbelieved because their "bread and meat" depended upon their giving testimony favorable to their employer. *Id*. at 779, 148 S.E. 679. We observed that there was no evidence that the defense witnesses had committed perjury for the sake of retaining their jobs, that counsel's argument was calculated to obtain a prejudicial result, and that the harm to the defendant consisted of depriving it of the central ingredient of the judicial system: a fair and impartial tribunal. Justice Campbell wrote: "Trial courts should be the forum in which litigants should have their rights determined according to the rules of law, instead of becoming arenas in which counsel engage in a battle of wits." *Id*. at 777-78, 148 S.E. at 679.

We have continued to the present time to adhere to the views expressed in the foregoing cases. Where counsel makes an improper statement and the court takes prompt action to remove it by appropriate instruction to the jury, it will ordinarily be pre-

sumed that the jury heeded the instruction and that no lasting harm was done. But where the prejudicial effect is so overwhelming that it cannot be removed by the court's instruction, the injured party, if he requests it, is entitled to a new trial. *Saunders* v. *Commonwealth*, 218 Va. 294, 303, 237 S.E.2d 150, 156 (1977). The injured party's right to a new trial is especially strong where his opponent has persisted in an objectionable course of conduct after the trial judge has expressed disapproval of it, sustained an objection to it, or instructed the jury to disregard it. In that situation, an appellate court will presume that the prejudicial effect of the improper conduct was too strong to be removed by further admonitions or jury instructions.

■ It is regrettable, as we observed in *Robertson's Ex'r.*, quoted above, that a litigant must be penalized for an attorney's misconduct, but where it is apparent that the effect of the misconduct has been such as to preclude the possibility of an impartial trial, it is better that the penalty fall on the party who stood to benefit by the misconduct rather than on the party injured by it.

■ In the present case, plaintiff's counsel had every right to cross-examine opposing witnesses to establish bias and to seek to impeach them by any other legitimate means. He had an unrestricted opportunity to prove, if such proof was available, that they were participants, even to the point of committing perjury, in a nefarious conspiracy calculated to deny the plaintiff access to the facts. But the record is devoid of any such proof. There is not a particle of evidence that the defendants' witnesses were biased, untruthful, or motivated by any wrongful purpose. Counsel's repeated insinuations to that effect rested only on counsel's desire to communicate that idea to the jury.

■ The plaintiff's appellate counsel points out, correctly, that the trial judge ruled in the defendants' favor when objections were timely made, admonished plaintiff's trial counsel, and expressed disapproval of counsel's remarks in the jury's presence. The focus of the defendants' appeal, however, is upon the cumulative effect of plaintiff's counsel's repeated statements, persisted in notwithstanding the trial court's rulings. Because of that effect, defendants contend, their motion for a new trial should have been granted. We agree, and will reverse the judgment and remand the case for a new trial on all issues.

*Reversed and remanded.*