74

## CIRCUIT COURT OF ALBEMARLE COUNTY

Alexander R. Kory

   v.

Wesley H. McCluney et al.

April 29, 2002

Case No. 99-247

BY JUDGE PAUL M. PEATROSS, JR.

This matter comes before the Court on the post-trial motions of Defendants Wesley H. McCluney, Bradley Clark Kintz, and Richard W. Smith and the separate post-trial motions of Defendant Harrison Kerr Tigrett. In this case, Plaintiff Alexander R. Kory brought an action at law for damages stemming from an assault and battery that occurred on November 21, 1997, at the University of Virginia. After a two-day trial, the jury returned a verdict awarding Kory $120,000 in compensatory damages and $380,000 in punitive damages. Subsequently, Defendants McCluney, Kintz, Smith, and Tigrett have requested various forms of post-trial relief including judgment n.o.v., a new trial, and/or remittitur of damages.

*Brief Factual Summary*

When considering post-trial motions, the Court must view the evidence in the light most favorable to the party that received the jury's verdict. See *Shepard v. Capitol Foundry of Va., Inc.*, 262 Va. 715, 721, 554 S.E.2d 72, 75 (2001). As Kory received the jury's verdict here, the Court must consider the evidence in the light most favorable to him. In brief, the evidence presented at trial established the following.[1]

In the early morning hours of November 21, 1997, *Kory*, then a first year student at the University of Virginia, was walking alone along Rugby Road on the grounds of the University. After a late night out with friends, Kory was heading from the Rugby Road area toward his dormitory. At the intersection where Rugby Road, McCormick Road, and University Avenue converge, a car containing five men, also students at the University of Virginia at the time of this incident, approached Kory and profane banter was exchanged between Kory and the occupants of the car. The car was driven by Defendant McCluney and carried the other Defendants in this action, Kintz, Smith, and Tigrett, as well as Wesley Kaupinen, who is not a party to this action. Kory and the occupants of the car did not know each other.

Following the verbal exchange, Kory and the car driven by Defendant McCluney parted ways and Kory continued toward his dormitory on foot. Kory's path took him across the lawn in front of Alderman Library, down a stairway in Brown's College, and toward the Ruffner Footbridge which crosses Emmett Street and leads to the old section of the first year dormitories, where Kory lived.

As Kory continued walking toward his dormitory, however, Defendant McCluney turned his car around and drove along Alderman Road, around Brown's College to intercept Kory near the Ruffner Footbridge. When the car arrived near the footbridge, Defendant McCluney remained in or near the car while the other Defendants departed the car to look for Kory. Defendant McCluney remarked to a bystander a fight was about to take place. At or around this time, the car's fifth passenger, Kaupinen, got out of the car to walk home.

As Kory descended the stairs from Brown's College toward the Ruffner Footbridge, the Defendants spotted him and resumed their banter. At this point, Defendant McCluney remained near the car while the other Defendants

---

[1] This is merely a brief recitation of the facts of this case. The Court has reviewed the transcript from this trial, and the brief description here is not meant to serve as a substitute for the details set forth in the trial transcript.

taunted Kory. Noticing that he was outnumbered three to one, Kory began to walk more quickly toward the footbridge. Just as Kory approached the footbridge, Defendant Smith punched Kory in the face. Kory stumbled and was kicked once in the face and punched again in the face. Kory could not definitively identify which of the Defendants delivered the kick or the second punch to his face. Defendant Smith grabbed Kory's shirt, but the shirt ripped and Kory ran away in a panic for help. As Kory ran from the Defendants, he heard them laughing behind him.

From the assault, Kory's face was cut and he sustained injuries to his mouth which required more than two hours of surgery. Kory's medical bills attributable to the assault totaled approximately $2,300. In addition to his physical injuries, the experience was very emotionally upsetting to Kory. Though Kory's physical injuries healed within a few months, his emotional difficulties stemming from the assault persisted. The assault was also highly publicized in and around the University of Virginia. Because of the mental anguish and frustration that resulted from the assault, combined with the publicity surrounding the incident, Kory became increasingly uncomfortable at the University of Virginia and ultimately transferred to another university. After a two-day trial, the jury returned a verdict in favor of Kory. The jury awarded Kory compensatory damages against Defendants McCluney, Kintz, Smith, and Tigrett in the total amount of $120,000. The jury also awarded Kory punitive damages as follows: $60,000 against Defendant McCluney, $60,000 against Defendant Kintz, $200,000 against Defendant Smith, and $60,000 against Defendant Tigrett, for a total of $380,000 in punitive damages.

*Defendants' Motion for Judgment n.o.v.*

Defendants McCluney, Kintz, Smith, and Tigrett have moved that the Court enter judgment n.o.v. in their favor. The Court denies this motion.

In a civil action, a trial court has the authority to enter judgment n.o.v. where the verdict appears contrary to the evidence adduced at trial or is without evidence to support it. *See Carter v. Lambert*, 246 Va. 309, 313 (1993) (citing *Lane v. Scott*, 220 Va. 578, 581, 260 S.E.2d 238 (1979)).

[This authority, however,] can only be exercised where the verdict is plainly wrong or without credible evidence to support it. If there is a conflict in the testimony on a material point, or if reasonable [persons] may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute his conclusion for that

of the jury merely because he would have voted for a different verdict if he had been on the jury.

*Id.*

In light of these principles and upon review of the trial transcript, the Court finds that the jury's verdict in favor of Kory was based upon credible evidence. Therefore, the Court will not enter judgment n.o.v.

### *Defendants' Motion for a New Trial*

Based on allegations of impropriety by Plaintiff's counsel at trial, Defendants McCluney, Kintz, Smith, and Tigrett have moved for a new trial. Essentially, Defendants claim that Plaintiff's counsel made improper closing argument to the jury, attempted to violate the Court's evidentiary rulings throughout the trial and that the cumulative effect of the conduct of Plaintiff's counsel was so prejudicial to Defendants' case that a new trial must be ordered. Having reviewed each allegation of impropriety raised by the Defendants, the trial transcript, and the relevant case law, the Court concludes that a new trial is not warranted in this case.

While the Defendants have artfully cited many cases in their briefs, the case most favorable to their position is *Maxey v. Hubble*, 238 Va. 607, 385 S.E.2d 593 (1989). In *Maxey*, considering when improper conduct by counsel during trial may necessitate a new trial, the Supreme Court of Virginia stated:

> Where counsel makes an improper statement and the court takes prompt action to remove it by appropriate instruction to the jury, it will ordinarily be presumed that the jury heeded the instruction and that no lasting harm was done. But where the prejudicial effect is so overwhelming that it cannot be removed by the court's instruction, the injured party, if he requests it, is entitled to a new trial. The injured party's right to a new trial is especially strong where his opponent has persisted in an objectionable course of conduct after the trial judge expressed disapproval of it, sustained an objection to it, or instructed the jury to disregard it. In that situation, an appellate court will presume that the prejudicial effect of the improper conduct was too strong to be removed by further admonitions or jury instructions.

*Id.* at 615-16 (internal citation omitted).

In order to apply Maxey to the case at bar, a brief look at the facts of that case is necessary. Maxey was a medical malpractice case in which a patient

sued her doctor for injuries incurred during surgery. The trial court made a pretrial order that "physicians who had not treated the plaintiff, but who were to testify only as expert witnesses, could not be interviewed by opposing counsel . . . [but] that any physician who had treated the plaintiff was available to either side for interview and discovery." *Id.* at 610. As a result of this ruling, one Dr. Steffey, who was named as a prospective expert witness for trial and who had also treated the plaintiff, was "available to be interviewed by all parties." *Id.* In compliance with the court's pretrial order, defendant's counsel interviewed Dr. Steffey.

Despite the fact that defense counsel's interview with Dr. Steffey was completely in accord with the trial court's order, at trial, plaintiff's counsel attempted to show that the communications between Dr. Steffey and defendant's counsel was unethical and evidence of a conspiracy among local doctors. Plaintiff's counsel's first attempt to imply that Dr. Steffey's communication with defendant's counsel was unethical was greeted by an objection from defendant's counsel and mild reprisal from the court reminding counsel that the communication was proper under the court's pretrial order. *Id.* at 611. Continuing "undeterred" however, plaintiff's counsel again "immediately" attacked Dr. Steffey's ethics on the same topic and was similarly met with a second objection and instruction from the court. *Id.* at 611-12. As plaintiff's counsel later, on re-cross examination, "persisted" along this same line of improper questioning, a third objection was made by defendant's counsel and sustained by the court. *Id.* at 612. Plaintiff's counsel's continuing failure to correct its questioning led to a fourth objection by defendant's counsel, which was sustained, and ultimately to two motions for mistrial by defendant's counsel, both of which were denied by the court. *Id.* at 612-13. Each of these objections and motions for mistrial stemmed from plaintiff's counsel's persistent and flagrant attempts to violate the trial court's pretrial order.

At the close of trial, the jury returned a verdict in favor of the plaintiff. The trial court denied the defendant's motion to set aside the verdict and grant a new trial and entered judgment on the verdict. *Id.* at 614.

On appeal, in light of plaintiff's counsel's persistent and flagrant attempts, "from opening statement through closing argument," to violate the trial court's pretrial order and press the unethical conspiracy theory "notwithstanding the court's admonitions," *Id.* at 613, the Supreme Court of Virginia reversed the trial court's entry of judgment on the jury's verdict and remanded the case for a new trial.

In presenting their argument that a new trial should be granted in the case at bar, the Defendants have cobbled together a number of instances of

allegedly improper conduct by Plaintiff's counsel from various points at trial. The Defendants argue that, even if individual instances of Plaintiff's counsel's conduct, standing alone, are not enough to warrant a new trial, then the cumulative effect of Plaintiff's counsel's conduct requires a new trial. The Defendants' briefs particularly draw the Court's attention to one instance, during closing argument, in which Plaintiff's counsel made reference to the infamous Kitty Genovese murder in New York in an apparent attempt to imply that the jurors in this case would be like the onlookers to that infamous crime who failed to help a victim in trouble, if the jurors failed to help Kory here.[2] In addition to this episode, the Defendants have offered several other comments and questions by Plaintiff's counsel which Defendants claim impermissibly influenced the jury's verdict.

In deciding whether the conduct of Plaintiff's counsel in this case requires a new trial, the Court has reviewed each instance of allegedly improper conduct raised in the Defendants' briefs and examined the trial transcript to determine the context in which any comments or questions were made, whether objections by Defendants' counsel were timely made, whether the objections were sustained, and whether the Court took any action to minimize or eliminate the effect of any improprieties. Upon completing this examination, the Court agrees with Defendants that certain of Plaintiff's counsel's remarks during trial were improper (especially the Kitty Genovese episode); however, Defendants' counsel's objections to improper comments and questions were sustained, and the Court made appropriate remarks and instructions to the jury to prevent any improper influence. Moreover, any improper remarks by Plaintiff's counsel in this case, sprinkled over the course of a two day trial in various contexts, is distinguishable from the persistent and blatant attempts to violate a court order that necessitated a new trial in *Maxey*. In the Court's view, the conduct of Plaintiff's counsel in the case at bar, while occasionally improper, was not nearly as egregious as that complained of in *Maxey*. Finally, while not dispositive of the issue, the fact that Defendants' counsel never moved for a mistrial in this case (unlike the two motions for mistrial in *Maxey*), is probative on the issue whether, at the

---

[2] In response to this line of argument by Plaintiff's counsel, which was indeed improper, two objections were made and sustained by the Court. Further, the Court promptly instructed Plaintiff's counsel not to discuss other cases, but only "to talk about this one." Tr. at 526. When Plaintiff's counsel subsequently implied to the jury that their verdict would be widely reported in the media, another objection was made and sustained, and the Court immediately explained that this subject matter was "not before the jury, [and] not something the jury needs to consider." Tr. at 527.

time it occurred, Plaintiff's counsel's conduct so exceeded the limits of propriety as to warrant a new trial. Thus, the Court finds no "manifest probability" that Plaintiff's counsel improperly influenced the jury's verdict, see *Kitze v. Commonwealth*, 246 Va. 283, 288, 435 S.E.2d 583 (1993) (citation omitted), and therefore, Defendants' motion for a new trial is denied.

### *Defendants' Motion for Remittitur of Compensatory Damages*

Defendants McCluney, Kintz, and Smith have also requested that the Court reduce the amount of compensatory damages, as they contend such damages are excessive and bear no relation to the evidence presented at trial. Tigrett has also incorporated this motion as his motion. After reviewing the relevant law on this topic, the Court will not alter the jury's compensatory award.

While this court has the authority to "correct a verdict that plainly appears to be unfair or would result in a miscarriage of justice," the general rule is that "a circuit court should not disturb a jury verdict awarding damages which has been rendered fairly and is based on competent evidence." *Norfolk Beverage Co. v. Cho*, 259 Va. 348, 353, 525 S.E.2d 287 (2000). Emphasizing that the proper determination of damages generally lies within the province of the jury, the Supreme Court of Virginia has advised that:

> If the verdict merely appears to be large and more than the trial judge would have awarded had he been a member of the jury, it ought not to be disturbed, for to do so the judge then must do what he may not legally do, that is, substitute his judgment for that of the jury. [Only where the] verdict is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption, or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of fair and impartial decision [may] the judge, acting within his legal authority, [] correct the [jury's award].

*Id.* at 354.

Considering these principles, the Court has determined that the jury was properly instructed and rendered a valid compensatory award based on the evidence in this case. While the compensatory award may seem large if compared only to Kory's monetary losses which resulted from the assault, there was ample evidence from which the jury could have properly concluded

that Kory suffered significant harm that cannot be measured in monetary terms. The categories of damages given in Instruction 13 allowed the jury latitude in weighing the evidence before it. Attempting to place a dollar value on such harm is the role of jury, not the Court. In light of the evidence presented at trial, the jury's compensatory award does not "shock the conscience" of the Court, nor does the Court find that the jury's compensatory award was reached by impermissible means. Therefore, the Court confirms the jury's compensatory award.

## Defendants' Motion for Remittitur of Punitive Damages

The jury awarded the Plaintiff $120,000 in compensatory damages and a total of $380,000 in punitive damages, $60,000 each against Defendants McCluney, Kintz, and Tigrett, and $200,000 against Defendant Smith. The Defendants have filed a Motion for Remittitur, alleging that the punitive awards are excessive and should be reduced.

Under Virginia law, trial court judges have an affirmative duty to set aside a punitive damages award when the amount assessed "is so excessive as to shock the conscience and to create the impression that the jury has been influenced by passion, corruption, or prejudice, or has misconceived the facts or the law, or if the award is so out of proportion to the injuries suffered that it is not the product of a fair and impartial jury. . . ." *Smithey v. Sinclair Refining Co.*, 203 Va. 142, 146, 122 S.E.2d 872 (1961). When reviewing a punitive damages award, the trial court is to consider the following factors: (1) the defendant's ability to pay, (2) the reasonableness between the amount of the award and the damages sustained, (3) the measurement of punishment required, (4) the proportionality between compensatory damages and the punitive award, and (5) whether the award will amount to a double recovery. *See Poulston v. Rock*, 251 Va. 254, 263, 467 S.E.2d 479 (1996).

Applying these factors here, Defendants argue first that the punitive awards are excessive given the Defendants' financial condition. The jury received evidence regarding the financial worth of each defendant. Specifically, Defendant McCluney works as a manager at a shoe store and his total assets, consisting of a checking and savings account and a mutual fund, are approximately worth $8,000. Defendant Kintz is a licensed real estate agent. He has $4,600 in savings and he owns a ½ interest in real property valued at approximately $200,000. Defendant Tigrett has approximately $65,000 in savings. The jury received no specific information regarding the current salaries of McCluney, Kintz, or Tigrett. Defendant Smith testified at trial that he was a college student at George Washington University. Smith stated that

he was carrying a 3.4 grade point average and that he expected to graduate in three weeks. He also has approximately $7000 in savings and stock investments. Smith did not discuss his post-college plans or whether or not he had secured a job. Based on these figures, Defendants allege that the $380,000 in punitive awards exceeds each defendant's ability to pay and is therefore grossly excessive. Plaintiff counters that there is no evidence the Defendants would be financially ruined by the awards. Plaintiff also argues that these Defendants are (or will soon be) college graduates and that the Court should consider their future earning capacity when assessing their ability to pay.

In general, punitive damages should be sufficient to punish and deter a defendant but should not be so high as to destroy him financially. See *Poulston* at 264 (holding that punitive award of $25,000 would not "present an undue burden" to defendant owning assets worth $186,000 and monthly salary of $2,100); *Williams v. Garraghty*, 249 Va. 224, 237, 455 S.E.2d 209 (1995) (holding that the trial court prevented "financial ruin to [the defendant]" and therefore properly reduced a jury's punitive award from $100,000 to $25,000 where defendant's assets and salary totaled only $47,000); *Gazette, Inc. v. Harris*, 229 Va. 1, 51, 325 S.E.2d 713 (1985) (holding that punitive award of $250,000 would be "destructive" even though defendant's assets totaled one million dollars).

The issue of whether a defendant's future earnings should be considered when determining ability to pay a punitive damages award is one of first impression in Virginia. Some jurisdictions consider future earnings when reviewing a punitive award. *See, e.g., Norcon, Inc., v. Kotowski*, 971 P.2d 158, 176 (Alaska 1999) (considering the defendant's present and future financial condition and the effect of an award on each condition); *Rufo v. Simpson*, 86 Cal. App. 4th 573, 103 Cal. Rptr. 2d 492, 526 (Cal. App. 2001) (holding that whether defendant's "financial prospects are bleak or bright is relevant to the ultimate issue whether the damages will ruin him or be absorbed by him"); see generally Model Punitive Damages Act, § 7(a) (1996) (listing nine factors which should be considered when determining fair punitive awards, including "the defendant's present and future financial condition and the effect of the award on each condition"). However, the Supreme Court of Virginia has not directly indicated that a defendant's future financial condition is relevant in assessing punitive awards in Virginia. See *Poulston*, 251 Va. 254 at 263-64 (considering defendant's current assets and monthly salary); *Williams*, 249 Va. 224 at 237 (assessing the effect of the award on defendant in light of her current assets and yearly salary); *Gazette*, 229 Va. 1 at 51 (assessing destructive effect on defendant's assets).

To guide the Court's decision in this matter, the Defendants cite a Louisiana case in which the Louisiana Court of Appeals considered the notion of future earnings and punitive damages in some detail. *Bienvenu v. Dudley*, 682 So. 2d 281, 285 (La. App. 1996). The *Bienvenu* court noted that, unlike compensatory damages, whose purpose is to repair the damage caused by the defendant, punitive awards seek to punish the tortfeasor and deter future wrongdoing. See *id.* Knowledge of the defendant's wealth at the time of sentencing is therefore necessary when assessing punitive damages, whereas evidence of the defendant's wealth at the time of the offense is not relevant in fashioning an effective punishment for the defendant. See *id.* Similarly, "any consideration of the tortfeasor's future worth or earning capacity, unless reasonably certain, would be predicated on mere guesswork, speculation, and conjecture." *Id.* (emphasis added). The Court agrees with the reasoning in *Bienvenu*. Unless they can be proven with some degree of reasonable certainty, a defendant's future earnings are too speculative and should not be considered when assessing the destructive effect that a punitive award will have on the defendant.

It is important to note, however, that while this Court will not speculate as to how much money each Defendant in the present case may some day acquire, each Defendant's current ability to pay is relevant and is determined by evaluating annual salary plus current assets. See *Poulston*, 251 Va. 254 at 263-64 (considering defendant's current assets and monthly salary); *Williams*, 249 Va. 224 at 237 (assessing the effect of the award on defendant in light of her current assets and yearly salary). Defendants allege that the punitive awards in this case are excessive in light of each Defendant's net worth; however, the Defendants failed to put on mitigating salary evidence for the jury and the Court to consider. While each Defendant offered specific testimony regarding the value of his current assets, no testimony was given regarding each Defendant's current salary.

It is not clear under Virginia case law which party bears the evidentiary burden of production with respect to a defendant's financial worth; however, the Circuit Court of Fairfax County, Virginia, addressed this issue in *Markowitz v. Re/Max Preferred Properties*, 42 Va. Cir. 292 (1997), and this Court agrees with the reasoning in *Markowitz*. Finding the issue one of first impression in Virginia, the *Markowitz* court looked to *Kunstler v. Britt*, 914 F.2d 505 (4th Cir. 1990), for guidance. *Id.* Addressing the allocation of the evidentiary burden with respect to Rule 11 sanctions, the Court of Appeals in *Kunstler* stated:

> Rule 11 sanctions are analogous to punitive damages. . . . Inability to pay what the court would otherwise regard as an appropriate sanction should be treated as reasonably akin to an affirmative defense, with the burden of the parties being sanctioned to come forward with the evidence of their financial status.

*Id.* (*quoting Kunstler* at 524). The *Markowitz* court noted that the tortfeasor has the greatest access to his financial information and, absent a rule requiring the defendant to produce his own financial evidence at trial, "defendants would be free to exercise the strategically logical choice of abstaining from introducing such evidence and then challenging the propriety of any substantial award post-verdict." *Id.*

Here, Defendants failed to introduce evidence regarding their salaries, yet they seek the Court to reduce the punitive awards in light of their financial worth. The Supreme Court of Virginia recently held that, "while evidence of net worth is relevant, the appropriate amount of a punitive damage award can be established by other evidence, and the lack of evidence of the wrongdoer's net worth does not itself defeat the punitive award." *Flippo v. CSC Assoc.*, 262 Va. 48, 58, 547 S.E.2d 216 (2001). Accordingly, any lack of evidence here regarding Defendants' financial worth is solely the fault of the Defendants and will not serve to reduce the punitive awards.

In summary, therefore, the Court has an affirmative duty to review the punitive awards in light of each Defendant's ability to pay as determined by his current financial worth, i.e., salary plus assets. The burden of proving financial worth is on the Defendants, and the lack of evidence regarding Defendants' net worth will not defeat a punitive award. Because the Defendants failed to put on evidence regarding present salaries, the Court will consider each Defendant's ability to pay based on his current assets as presented at trial and in light of a salary that the Court is reasonably certain each Defendant can presently earn, approximately $30,000 per year. To avoid undue financial hardship, the punitive awards will be reduced so that they are no greater than ½ the net worth of each Defendant. The punitive awards are therefore reduced as follows: (1) the award of $60,000 against Defendant McCluney is reduced to $19,000; (2) the award of $60,000 against Defendant Kintz stands at $60,000; (3) the award of $60,000 against Defendant Tigrett is reduced to $47,500; and (4) the award of $200,000 against Defendant Smith is reduced to $18,500. Although Defendant Smith is a student and is not currently employed,[3] the Court is reasonably certain that Smith will be

---

[3] Note that, when Smith testified on November 27, 2001, he stated that he expected to graduate in three weeks.

able to secure a job after college earning at least as much as his co-defendants. In the alternative, the Court is also reasonably certain that Smith could put his education plans on hold for the time being and secure a job to meet his financial obligations. As the main tortfeasor responsible for Plaintiff's injuries, it would not be just to allow Defendant Smith to avoid paying virtually any punitive damages simply because he chooses to remain in school rather than seek employment. The total punitive damages award is therefore reduced from $380,000 to $145,000.

In considering the remaining *Poulston* factors, the Court does not find that the punitive awards, in their now reduced form, are unreasonable on the basis of the damages sustained and the measurement of punishment required. A reasonable jury could have concluded that the attack on the Plaintiff was egregious and outrageous. Plaintiff also presented evidence at trial from which a jury could reasonably conclude that the Plaintiff sustained substantial damages from the attack in the form of medical damages, pain and suffering, emotional distress, embarrassment, and humiliation.

The Court does not find that the punitive awards are disproportionate to the compensatory damages award of $120,000, especially in their reduced form. See *Poulston*, 254 Va. at 263 (holding that "the relationship between $10,000 compensatory and $25,000 punitive damages is not unreasonable or strikingly out of proportion"). Finally, double recovery is not an issue in this case.

Accordingly, the jury verdict for punitive damages in the amount of $380,000 will be reduced to $145,000 to be allocated among the Defendants in the manner described above, and the Court will enter judgment in that amount.

## Conclusion

For the reasons stated, the Court will enter judgment for the sum of $120,000 in compensatory damages and $145,000 in punitive damages as noted above. Interest shall commence on the date the verdict was rendered or November 28, 2002, at the rate provided for by § 8.01-382 of the Code of Virginia of 1950, as amended.

The remaining motions of Defendants are denied.