Present:  All the Justices

RAPPAHANNOCK PISTOL AND
RIFLE CLUB, INC.

                                        OPINION BY
v.  Record No. 001622      CHIEF JUSTICE HARRY L. CARRICO
                                         June 8, 2001
ROBERT T. BENNETT, ET AL.

              FROM THE CIRCUIT COURT OF LANCASTER COUNTY
                    J. Peyton Farmer, Judge Designate

        In a motion for judgment filed below, Rappahannock Pistol

and Rifle Club, Inc. (the Club) sought compensatory and punitive

damages against Robert T. Bennett and Catherine A. Bennett (the

Bennetts) for their allegedly tortious interference with a

contract between the Club and C.F. Lumber Co., Inc. (C.F.

Lumber).  The trial court struck the Club's claim for punitive

damages, and a jury awarded the Club $125,000.00 in compensatory

damages.  Upon motion of the Bennetts, the trial court set the

verdict aside on the ground the Club failed, as a matter of law,

to prove the Bennetts tortiously interfered with the contract.

The court entered final judgment in favor of the Bennetts, and

we awarded the Club this appeal.

        In Stover v. Norfolk & Western Ry. Co., 249 Va. 192, 455

S.E.2d 238 (1995), we stated as follows:

            When the verdict of a jury has been set aside by the
        trial court, the verdict is not entitled to the same weight
        upon appellate review as one that has received the trial
        court's approval.  Nonetheless, when considering the facts
        under these circumstances, the appellate court will grant
        the party prevailing before the jury benefit of all

reasonable inferences that may be drawn from the evidence and of all substantial conflicts in the evidence.

Id. at 194, 455 S.E.2d at 239-40. See also Kelly v. Virginia Elec. & Power Co., 238 Va. 32, 34, 381 S.E.2d 219, 220 (1989). We shall state the facts with these principles in mind.

Since its inception in 1982, the Club has operated a shooting range on leased premises near Whitestone in Lancaster County. Desiring to build a clubhouse and expand its operations, the Club conducted a ten-year search for a new site, culminating in the discovery of a 53-acre parcel in the Regina area of Lancaster County owned by C.F. Lumber, of which C.F. Carter, Jr., was the president and sole stockholder. The 53-acre parcel (the Property) met all the Club's criteria for a new site.

In a written contract dated January 24, 1997, C.F. Lumber agreed to sell the Property to the Club. The contract provided that the Club would pay the purchase price of $22,000.00 at closing and that "[t]ime is of the essence," with settlement to be made "on or before February 24th, 1997 or as soon thereafter as title can be examined and papers prepared allowing a reasonable time to correct any defects reported by title examiner."

Following the signing of the contract, members of the Club visited residents of the Regina area to explain the Club's plans

for a shooting range.  According to the testimony of Club members, reaction to the plans was positive, with some of the residents indicating an interest in becoming members of the Club.

The Bennetts, both of whom are licensed real estate agents, own a farm located approximately one and one-half miles from the Property.  They joined those opposed to the proposed shooting range after learning of the Club's plans from Rebecca George, a neighbor.  In a telephone conversation with Ethel Register, the wife of Marvin Register, chairman of the Club's committee to search for a new site, Catherine Bennett stated that "she hated guns," that "anybody who owned a gun automatically had to be a bad person," and that Ethel Register's husband "had to be a bad person because he owned a gun."[1]  Catherine repeated these statements in calls to Ethel Register over the next three days, becoming more agitated with each call.  In one of the calls, Catherine told Ethel that Robert Bennett "was writing a noise ordinance that would have an effect in Lancaster County of eliminating hunting."

On February 15, 1997, members of the Club conducted a test at the Bennetts' property to determine "if there was any noise factor that could be heard at [the Bennett] place" from "any

3

firing down on [the proposed shooting] range."  According to the testimony of Marvin Register, who participated in the test, when two shots each were fired from a pistol, a rifle, and a shotgun, the sounds were "very faint."  However, the Bennetts said the noise was objectionable, and a tearful Catherine Bennett said that she wanted the shooting range "out of the County," that she was a realtor, and that she would find the Club "a perfect spot."  She asked Register whether the Club was "going to go ahead with this after all [she had] said."  When he answered in the affirmative, she stated:  "Then I will do whatever is necessary to make sure that you never use that site at Regina for a range.  This game isn't over.  I will do whatever is necessary, whatever it takes, and I always win."

On February 17, the Bennetts prepared and signed a backup contract, offering to purchase the Property for $26,000.00.  The Bennetts placed the contract with their attorney, Paul C. Stamm, Jr.  Included was a cover letter addressed to Raymond Wesley Edwards, attorney for C.F. Lumber and its president, C.F. Carter, as well as a check for $6,000.00 payable to Edwards as a deposit on the purchase price.  A copy of the cover letter was sent to Carter.  Robert Bennett admitted in his testimony that

---

[1] Interestingly, Robert Bennett testified that he and Catherine owned a pistol and a rifle, leased their farm to a hunt club, and regularly attended the hunt club's annual dinner.

4

he and Catherine decided to buy the Property because the Club "wanted to locate a firing range there."

On February 18, Catherine Bennett and her attorney, Stamm, visited Edwards, attorney for C.F. Lumber and Carter, whose office was on the second floor of Stamm's building. Catherine told Edwards "how she had to have [the Property] because the shooting on that piece of property would bother her [ewes] when they were having lambs and how the rifle fire would knock the plaster off of the walls." Testifying as a witness for the Club, Edwards stated that he told Catherine there was "a valid contract out on that piece of property" and as far he could see "under law, that is where it is gone." When Stamm told Edwards the Bennetts had a backup contract on the Property, Edwards said that "[i]f the time comes that a back-up contract would be appropriate," he "would submit it to Mr. Carter for his consideration." Stamm told Edwards the backup contract was "right downstairs any time you want to look at it."

Also on February 18, Edwards discussed with Carter the validity of C.F. Lumber's contract with the Club, particularly "the portion about 'time is of the essence.' " It was apparent at that point the contract could not be closed on February 24th, as the contract required, because Edwards had been unable to obtain certain documents from C.F. Lumber's predecessor in title that were necessary before the transaction could be closed.

5

Edwards advised Carter that it was C.F. Lumber's responsibility to obtain the documents, that the contract was still valid, and that only the Club could exercise the "time is of the essence" provision of the contract.

On February 20, members of the Club attended a meeting arranged by Rebecca George.  The members expected to join "a handful of people" to consider the views of a young mother concerned about the safety of her child as a result of the Club's proposed shooting range.  Instead, the meeting place "was jam packed full of people," numbering more than sixty, most of whom were "very hostile" to the Club's proposal.  The Bennetts were present, but remained "relatively quiet."  Catherine Bennett engaged Marvin Register in conversation.  She asked him whether the contract between the Club and C.F. Lumber had been closed.  When he said the contract had not yet closed, she said that February 24 was "the last day . . . [t]hat is what the contract says."  He responded, "No, it's been extended."  She then offered to purchase the Property for $22,000.00.  Register said the offer would not be of interest to the Club because "that is exactly what we are paying for the land."

Also on February 20, Carter, on behalf of C.F. Lumber, executed a deed conveying the Property to the Club.  The next day, Carter delivered the deed and other closing documents to the Club's counsel, to be held in escrow.

On February 24, Catherine called Edwards' office and left him a message. The message stated that Catherine had sent a check and agreement to a representative of C.F. Lumber and that her attorney, Stamm, "has a check and offer downstairs."

On February 26, Edwards' secretary received a telephone call from Carter that she remembered "very well" because he was "very upset with [her]." Carter "spent a great deal of time telling [the secretary] that he did not want [her] to ever give his telephone number to anybody, and [she] had given it to Mrs. Bennett." According to the secretary, Carter went on to say that he did not want to sell the Property to the Club, "if at all possible," because "[h]e couldn't stand the aggravation."

When Edwards returned Carter's call, Carter stated that "he did not want to sell [the Property] to the Pistol and Rifle Club; that it was a very aggravating situation; that he had received several phone calls. He mentioned [that] this sale has been all over the newspaper and he was concerned as a business — as most businessmen, that they don't want . . . a big public disclosure of all his big activities." According to Edwards, Carter said he received a number of telephone calls "from 'a bunch of women,' " and he "mentioned Mrs. Bennett's name" and said "she had called him up and he didn't need any more." Edwards was under the impression that "something was bothering [Carter]." Edwards again advised Carter that C.F. Lumber's

7

contract with the Club was still valid and that he, Carter, "would be held accountable for it to some point."

On February 27, the Bennetts and a group of their neighbors, through their counsel, William G. Broaddus, presented an emergency ordinance to the Board of Supervisors of Lancaster County that would have, according to the Club, prevented its use of the Property. The Board of Supervisors declined to adopt the ordinance on an emergency basis. It did, however, amend the County's zoning ordinance, effective October 1997, in a manner that would require the Club, if it sought to use "an alternative site," to meet certain requirements it would not have had to meet had it acquired the Property according to its contract with C.F. Lumber.

On February 27 or 28, Carter went to Stamm's office and told Stamm to close the Bennetts' purchase of the Property. Stamm advised Carter to see his own counsel, Edwards. Carter visited Edwards' office on the morning of February 28 and "wanted to talk . . . about not going through with [the] contract" with the Club. Edwards told Carter that the Club's contract was valid and that, if he did not go through with it, he was subject to suit by the Club. When Carter left, Edwards thought he would go through with the Club's contract.

However, on the afternoon of February 28, Stamm, the Bennetts' counsel, told Edwards that Carter wanted to close on

8

the sale of the Property to the Bennetts that day.  Edwards telephoned Carter and repeated his advice that the Club's contract was valid and that Carter was exposing himself to potential suit by selling the Property to the Bennetts. According to Edwards, Carter said:  "I don't care.  I am going to have it closed on this afternoon, and . . . do what you got to do."[2]  Edwards then informed Stamm that Carter wanted to "close this afternoon," and Stamm said he "had it all ready." Carter signed the Bennetts' backup contract, Carter and his wife executed a deed conveying the property to the Bennetts, and Stamm conducted the closing and recorded the deed, all on February 28.

On March 6, Edwards received the documents whose earlier absence had prevented the closing of the sale of the Property to the Club on February 24.  Edwards testified that C.F. Lumber would have been in a position to close the sale to the Club on March 6 but for the sale to the Bennetts.

At the time of trial, the Club had found only one suitable replacement site, but it contained 266 acres and was priced at $245,000.00, an amount the Club considered "out of the

---

[2] Carter testified that he disagreed with Edwards that the Club's contract with C.F. Lumber was still valid after February 24, 1997, the date fixed in the contract for closing.  Carter, who had sold some two hundred parcels of real estate in the past ten years, said he considered the "time is of the essence" provision

question."  The Club had also filed an action for damages against C.F. Lumber and recovered a judgment for $4,000.00, the difference between the original sale price in the Club's contract with C.F. Lumber and the sale price in the Bennetts' backup contract.

On appeal, the parties discuss the elements a plaintiff must establish in proving a case of tortious interference with a contract.  The parties agree on four of the elements, both sides citing the same case, Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97 (1985), as authority.  There, we stated as follows:

> The elements required for a prima facie showing of the tort [of intentional interference with a contract] are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

Id. at 120, 335 S.E.2d at 102.

The Bennetts contend, however, that, in this case, the Club had to establish a fifth element.  Citing Duggin v. Adams, 234 Va. 221, 360 S.E.2d 832 (1987), and Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co., 254 Va. 408, 493 S.E.2d 375 (1997), the Bennetts argue that "[i]f the contract survived [the closing date], it must have become a contract at will, subject to

---

rendered the contract void when the Club failed to close on February 24.

10

cancellation by [C.F. Lumber] because of the violation of the time of the essence clause."  The Bennetts then say that because the contract was terminable at will, "the burden on the [Club] increases," requiring it to prove the Bennetts "used improper methods" to induce C.F. Lumber to breach the contract.  On the other hand, the Club says that it only had to establish the elements applicable to a contract not terminable at will, as approved in Chaves, and that it did not have to prove the Bennetts "used improper methods" to induce C.F. Lumber to breach the contract.

We do not need to resolve this issue.  It has been settled by the granting below of an instruction that is not questioned on appeal and, hence, has become the law of the case.  Bostic v. Whited, 198 Va. 237, 239, 93 S.E.2d 334, 335 (1956).  Embodying the principles stated in Chaves, the instruction is worded as follows:

> You shall find your verdict for the [Club] if [it] proved by the greater weight of the evidence:
>
> (1) that there was a valid contract between the [Club] and C.F. Lumber Co., Inc.; and
>
> (2) that the [Bennetts] knew of this contract; and
>
> (3) that the [Bennetts] intentionally caused C.F. Lumber Co., Inc. to breach its contract with [the Club]; and
>
> (4) that the [Club] was damaged by the breach of contract.

You shall find your verdict for the [Bennetts] if the [Club] failed to prove any one or more of these elements.

It will be noted that the instruction did not require the Club to prove the Bennetts "used improper methods" to induce C.F. Lumber to breach its contract with the Club. Therefore, the requirement did not exist.

However, under the third element of the instruction, the Club was required to prove that the Bennetts intentionally caused C.F. Lumber to breach the contract with the Club. The Club says it made a prima facie showing of this element by establishing that "the Bennetts engaged in a persistent, affirmative and intensive course of conduct intended to cause [C.F. Lumber] to breach the contract." According to the Club, its evidence showed that the Bennetts "whipped the neighborhood into [a] frenzy of opposition," "turned the neighborhood against [the Club]," "led the neighborhood effort to prevent [the Club] from buying the property," "created the notoriety which resulted in the media coverage which was a concern to Carter," and "[w]ith knowledge of the [Club's] contract [with C.F. Lumber], . . . negotiated a contract to buy the property for a higher price." The Club also says that Catherine Bennett "tried to coerce [the Club] to withdraw [from the contract with C.F. Lumber] through her threats following the demonstration of February 15."

12

But it must be borne in mind that it is the corporation, C.F. Lumber Co., Inc., in the person of Carter, its president and sole stockholder, that the Club must show was induced by the Bennetts to breach the contract between the Club and the corporation.  It is irrelevant what the Bennetts may have done to induce the Club to abandon its plans.  It must also be noted that it is only what the Bennetts did, and not what their neighbors or others may have done on their own, that is relevant to the question whether the Bennetts are liable to the Club.

There is absolutely no evidence to show that Carter knew of anything Catherine may have said to Ethel Register in their telephone conversations early on in the squabble over the Club's plans, or anything the Bennetts said or did during the demonstration by the Club members at the Bennetts' farm on February 15, 1997, or anything Catherine said to Marvin Register at the public meeting arranged by Rebecca George.  Nor was it even shown that Carter knew of Catherine's contacts with Carter's and C.F. Lumber's counsel, Raymond W. Edwards, even though Edwards testified as a witness for the Club.  Finally, there is nothing to indicate that the Bennetts did anything, by way of newspaper advertisements or otherwise, to instigate the media coverage of the public controversy that erupted over the Club's proposed use of the Property.

The Club says on brief, however, that Carter "received aggravating telephone calls from Catherine and had been threatened by her with public disclosure of his business activity." This misrepresents the record. The Club cites two references to the joint appendix as the sources of the statement. First, testifying as a witness for the Club on direct examination, Edwards relates a conversation he had with Carter, as follows:

> A. The conversation was by Mr. Carter stating that he did not want to sell the property to the Pistol and Rifle Club; that it was a very aggravating situation; that he had received several phone calls and he didn't like these kinds of phone calls. He mentioned to me, you know, this sale has been all over the newspaper and he was concerned as a business — as most businessmen, that they don't want a large — I believe and from what he told me — a big public disclosure of all his big activities.

> Q. And when he said he received a number of telephone calls, did he say from whom?

> A. He said from "a bunch of women", is how he phrased it to me.

It will be noted that in this repartee, the name of Catherine Bennett is not even mentioned as being the source of any telephone calls. Nor by any stretch of the language reported can any threat to Carter be inferred, let alone established by a preponderance of evidence.

Second, with Edwards testifying on redirect, these questions and answers followed:

14

Q.   The messages that you testified that you received: You got one from Mr. Carter, that didn't mention the Bennett's, did it, when he said that he did not want to sell to the Gun Club?

A.   No. No. He didn't say, I want to sell to the Bennett's.

Q.   And I think on another occasion you said that he had received phone calls from several women?

A.   Uh-huh.

Q.   And he didn't mention the Bennett's?

A.   He mentioned Mrs. Bennett's name.

Q.   He did mention?

A.   Yeah.

Q.   What did he tell you about Mrs. Bennett?

A.   That she had called him up and he didn't need any more.

Q.   That he didn't need any more of those telephone calls?  Who else did he name as calling?

A.   Didn't name anybody else, just "those women."

Q.   "Those women"?

A.   Yes.

Q.   Okay.

This time, by prompting Edwards, the Club got Catherine Bennett's name into the story.  But it was the Club's lawyer, not Edwards, who used the plural noun "call<u>s</u>" as related to Catherine Bennett's contact with Carter.  Edwards stated only that Catherine had "called [Carter] up," indicating Catherine

15

had made only one telephone call.  And Edwards never even came close to saying, as the Club claims on brief, that Carter "had been threatened by [Catherine Bennett] with public disclosure of his business activity."[3]  Hence, the record utterly fails to support the Club's claim that Carter "received aggravating telephone calls from Catherine and had been threatened by her with public disclosure of his business activity."

Remaining is the Club's contention that the Bennetts caused C.F. Lumber to breach the contract when, "[w]ith knowledge of the . . . contract, [they] negotiated a contract to buy the property for a higher price."  However, as the trial judge stated in a letter opinion, "[t]he act of purchasing the property for a price greater than that provided for in the [Club's] contract with Carter does not, in and of itself, constitute tortious interference."  The Club had the burden of showing not only that the backup contract existed but also that its existence caused C.F. Lumber's refusal to close on its contract with the Club.  Yet, the Club did not produce any testimony or other evidence linking the existence of the backup

---

[3] In his testimony, Carter said he talked to Catherine Bennett on the telephone one time.  He "guess[ed]" the conversation took place in "[t]he middle of January [1997]."  He said "she wanted to know if she could buy the property and [he] told her that it was under contract; but if the contract didn't go through, that [he] would get back in touch with her."  When asked whether the Bennetts had threatened him, Carter replied, "No."

16

contract to C.F. Lumber's refusal, and the link cannot be inferred from the evidence that was produced.

Indeed, if any inference can fairly be drawn from the evidence, it would support the Bennetts' position. Three attorneys versed in real estate matters testified without contradiction that the use of backup contracts is an accepted practice. Raymond W. Edwards, counsel for C.F. Lumber and Carter, described a backup contract as "an offer made by a party who wants to buy the same piece of property that's already been placed under contract with another party," and he testified that the use of backup contracts is recognized in "real estate circles." William G. Broaddus, counsel for the Bennetts, testified that the use of backup contracts is "certainly not unusual" and is especially appropriate when the contract backed up provides that time is of the essence. Paul C. Stamm, another counsel for the Bennetts, testified that he had closed "[m]any, many" backup contracts. And Broaddus testified that he and Stamm "suggested" to the Bennetts that they might "well wish to consider submitting what is commonly called a 'backup offer' to the seller."

In conclusion, we agree with the trial court that the Club failed, as a matter of law, to prove that the Bennetts

17

tortiously interfered with the Club's contract with C.F. Lumber.[4]

Accordingly, we will affirm the judgment of the trial court.

Affirmed.

---

[4] In view of this conclusion, we do not reach the Club's additional contention that the trial court erred in striking its claim for punitive damages.