## CIRCUIT COURT OF THE CITY OF ROANOKE

Ron Eric Simmons
and Kristie Petty Simmons,
Co-administrators of
the Estate of Justin Eric Simmons,
deceased

 v.

MTD Products, Inc.

February 29, 2008

Case No. CL04001142

BY JUDGE CLIFFORD R. WECKSTEIN

A jury found that MTD Products, Inc., is legally responsible for the death of Justin Eric Simmons, a four-year-old boy; awarded compensatory damages of $2 million, and allocated the damage award among Justin's statutory beneficiaries. MTD asks the court to set aside the jury's verdict and enter judgment in its favor; or, if that motion is denied, to grant a mistrial motion taken under advisement at trial; or to set the verdict aside and order a new trial. Applying familiar principles, I state the facts in the light most favorable to the plaintiffs, the parties for whom the jury found, giving them the benefit of any conflicts in the evidence and of any inferences to be drawn from the evidence. *See Rappahannock Pistol & Rifle Club, Inc. v. Bennett,* 262 Va. 5, 7-8, 546 S.E.2d 440 (2001); *T. M. Graves Constr., Inc. v. National Cellulose Corp.,* 226 Va. 164, 168-70, 306 S.E.2d 898 (1983).

Justin Simmons suffered fatal injury when three powered lawn mower blades, spinning at approximately 200 miles an hour, penetrated his scalp, his skull, his brain, and the membrane around his brain. His life had spanned four years and one week.

MTD designed, manufactured, and distributed the lawn tractor or riding lawn mower whose blades killed Justin. (The terms "riding lawn mower" and "lawn tractor" are used interchangeably.) Although MTD was not the retail seller of the lawn mower, the parties stipulated that there was a sale and that MTD placed the mower into the stream of commerce. This, the parties agreed, placed MTD effectively in the shoes of the retail seller and eliminated any need for the retailer (whom the plaintiffs also had sued) to remain a party to the suit.

Justin was survived by his younger brother, Josh, and by his parents, Ron Eric Simmons and Kristie Petty Simmons, who, having qualified as his personal representatives, are the plaintiffs in this suit.

MTD's post-trial filings raise three questions:

Whether the jury's decision to allocate $1 million to Justin's baby brother is insupportable, and thus shows that the verdict was based on prejudice or sympathy?

Whether the court should now grant a mistrial motion that it took under advisement during the trial?

Whether a verdict that MTD was legally responsible for Justin's death must be set aside as contrary to the law and the evidence?

### The Events Surrounding Justin Simmons's Death

Roberta N. Reedy (also known as Elmira Roberta Reedy), who was licensed by the state to care for children in her home, had been Justin's day care provider since he was eleven years old. On the day of Justin's death, Mrs. Reedy was responsible for the care of five children, including Justin and his one-year-old brother, Josh.

Mrs. Reedy and her husband, Orvil, knew that Justin was fascinated by their riding lawn mower, and by tractors, bulldozers, and similar equipment. On the day of his death, Justin had been excited to know that Mr. Reedy was going to mow the grass. He accompanied Mr. Reedy to the mower and held a wrench or a rag, "helping" Mr. Reedy as he charged the battery and cranked the mower's 18-horsepower engine for the first time that spring.

Mr. Reedy began to mow. Mrs. Reedy took another child inside to change a messy diaper. Both Mr. and Mrs. Reedy knew that Justin was playing in their large yard by himself, unsupervised and unattended. Violating

her own sound safety rule that no children could be in the yard while the mower was in use and violating state regulations for caregivers, Mrs. Reedy lost sight and control of Justin.

MTD manufactured the lawn tractor in 1988. A neighbor of the Reedys had owned it. Mr. Reedy had borrowed it on occasion. In approximately 2002, Mr. Reedy learned that the neighbor was going to discard it and asked if she would give it to him, which she did. He had never read (nor possessed) an owner's manual for the mower, nor had he read any of the labels or warnings on the mower itself. Notwithstanding a prominent warning on the mower, he was unaware that it was missing a deflector guard, an important safety device.

On the day of Justin's death, Mr. Reedy and Justin had been outside for half an hour or more. Much of that time was devoted to getting the mower ready. The rest of the time, Mr. Reedy was mowing, and Justin was on his own.

Mr. Reedy was mowing uphill on a slope of approximately 13.5 degrees. As he was mowing uphill, he testified at trial, he felt the transmission slipping, or the mower slipping out of gear. In a 911 call, however, he had said, "I was going up that way, and had backed up, and bang."

The lawn tractor rolled backwards, powered blades rotating. Mr. Reedy did not apply either the foot brake or the hand brake. Though he knew that Justin was in the yard, he did not look behind him. He did not disengage the mower's blades. He did not shift into reverse, which would have disengaged the blades. He knew that by pushing in the clutch, he could mow backwards. He had done it before.

The lawn tractor continued downhill, Mr. Reedy never looking behind him, mower blades rotating at approximately 200 miles an hour. (The jury heard that Mr. Reedy has said different things about what he was doing while rolling down the hill that "pril afternoon: that he pushed the clutch in to try to put the mower back in gear, or to engage any forward gear; that he purposely put the mower in neutral to allow it to roll down the hill; that he depressed the clutch to allow the mower to roll downhill; and that he was trying to "pop" the mower into gear.)

The mower struck Justin, the powered blades causing fatal injury. The engine stopped. (In one statement, Mr. Reedy said that he heard a "thud.") Before dismounting from the mower, Mr. Reedy — still not comprehending that he had struck someone or something — tried, unsuccessfully, to restart the engine. He left the mower seat, saw Justin's ankle extending from beneath the riding mower, and threw the mower to the side. The mower platform had been covering the rest of the small boy's body.

I. *Whether the jury's decision to allocate $1 million to Justin's baby brother is insupportable and thus shows that the verdict was based on prejudice or sympathy?*

MTD asserts that the jury's decision to allocate $1 million of its $2 million damage award to Josh Simmons (who was only a year old when his brother was killed) is insupportable and therefore demonstrates that the jury's decisions were motivated by prejudice and sympathy.

Although neither party called it to my attention,[1] the Supreme Court of Virginia has addressed this subject, saying this:

> The manner in which the damages are to be distributed is no concern of the defendant, and not under the control of the plaintiff [personal representative]. It is a question for the jury exclusively. . . .

*Norfolk & Western Ry. v. Stevens*, 97 Va. 631, 634, 34 S.E. 525 (1899); *Baltimore & Ohio RR. v. Wightman's Adm'r*, 70 Va. (29 Gratt.) 431, 441 (1877), *reversed on other grounds sub nom. Railroad Co. v. Koontz*, 104 U.S. 5 (1881); *see Knodel v. Dickerman*, 246 Va. 124, 431 S.E.2d 323 (1993) (citing *Wrightsman's Adm'r* on another point) (tortfeasor tried to limit number of persons to whom jury might allocate sums by moving in limine for finding that a child was not a sibling and statutory beneficiary of plaintiff's decedent. The child was living at home when the decedent died, but had not yet been adopted. Adoption was final by the time the death case was submitted to the jury. In an opinion by then-Justice Hassell, Supreme Court held that statute means what it says and that class of beneficiaries was not closed until the jury's determination is made).

The Supreme Court of Virginia also said this:

> Any recovery in an action for wrongful death can be distributed only in accordance with the express terms of Code §§ 8-636 and 8-638 [now §§ 8.01-52 and 8.01-53], which provide for two classes of beneficiaries. The preferred class includes the wife, husband, children, and grandchildren, while the deferred class

---

[1] *See* Virginia Rules of Professional Conduct, Rule 3:3(a)(3).

includes the parents, brothers, and sisters of decedent. *Between members of the same class the jury has absolute discretion as to who shall receive the whole or any part of the recovery* and the members of the deferred class cannot take unless there are no members of the preferred class.

*Matthews v. Hicks*, 197 Va. 112, 120, 87 S.E.2d 629 (1955) (emphasis added).

Those pronouncements of the Supreme Court are significant, of course, for "[i]n Virginia, the doctrine of *stare decisis* is more than a mere cliché. . . . And when a court of last resort has established a precedent, after full deliberation upon the issue by the court, the precedent will not be treated lightly or ignored, in the absence of flagrant error or mistake." *Castle v. Lester*, 272 Va. 591, 601-02, 636 S.E.2d 342 (2006) (quoting *Pulliam v. Coastal Emergency Servs., Inc.*, 257 Va. 1, 10, 509 S.E.2d 307 (1999), which quoted *Selected Risks Ins. Co. v. Dean*, 233 Va. 260, 265, 355 S.E.2d 579, 581 (1987)).

A $2 million compensatory damage award for Justin Simmons's wrongful death does not shock the conscience of the court; it is in no way disproportionate to the loss suffered. *See Shepard v. Capital Foundry of Va., Inc.*, 262 Va. 715, 720-21, 554 S.E.2d 72 (2001) (quoting *Edmiston v. Kupsenel*, 205 Va. 198, 202, 135 S.E.2d 777 (1964). Coincidentally, MTD Exhibit ZZ, which I declined to admit, a 1996 paper entitled "Ride-on Mower Backover Blade Contact Hazard and Solutions," said, at 1, "A projected statistical value of life of $2 million per death has been assigned in the United States. . . .") In fact, as the plaintiffs note in their reply memorandum, MTD does not contend that the overall damage award is excessive. It focuses only on the allocation of damages.

MTD argues that sorrow, mental anguish, loss of solace, and loss of services, protection, care, and assistance "were the only elements of damages permissible pursuant to the agreed-upon jury instruction." This is incorrect. Those factors are enumerated in Instruction 13, as they are in Va. Code § 8.01-52. The instruction, like the statute, told the jury that, if it found for the plaintiffs, then "in determining the damages to which they are entitled, you shall include, *but are not limited to*, any of the following which you believe by the greater weight of the evidence were caused by the death of Justin Eric Simmons." (Emphasis added.) After listing the factors enumerated by MTD in its brief, the instruction continues, "Your verdict shall be for such sum as will fully and fairly compensate for the damages sustained as a result of the death

of Justin Eric Simmons. In the verdict form, you shall specify the distribution of the award among Justin's mother, Kristie Petty Simmons, father, Ron Eric Simmons, and brother, Joshua Cole Simmons." In closing to the jury, the plaintiffs' lawyer discussed the losses suffered by all three statutory beneficiaries, saying, *inter alia*, "You know, Joshua misses his brother in many ways that he does not understand now."

The jury instructions contained no guidelines about how to distribute any damage award. Neither party sought such an instruction, nor does MTD, in its criticism of the jury's decision-making, offer any suggestions about what such an instruction would say. The plaintiffs' response to this argument is on-point and incisive.

Governing authority states that the jury's allocation of damages is a subject about which criticism from the parties will not be heard, and that, in allocating among members of the same class, the jury's discretion is "absolute." I cannot say that the jury's allocation of damages among Justin's statutory beneficiaries of the same class furnishes any basis to question or set aside the verdict.

II. *Whether the court should now grant a mistrial motion that it took under advisement during the trial.*

When the plaintiffs, as they had an absolute right to do, moved to nonsuit their claims against Mr. and Mrs. Reedy, MTD moved for a mistrial. This subject reflects no glory on court or counsel. I should have denied the motion as soon as it was made. Instead, I must now set the scene.

Orvil Reedy, called by MTD, was the last witness who testified before the luncheon recess on the last day on which evidence was presented. Just before the jurors were excused for lunch, the court instructed them to disregard a comment made by MTD's lead lawyer to Mr. Reedy. After the jurors were excused, court and counsel continued the discussion on the record, and the court ascertained that no one wished to move for mistrial.

The MTD attorney, out of the jury's presence, complained that "the examination by counsel [apparently plaintiff's counsel[2]] certainly appears that

---

[2] *See* MTD Products, Inc.'s Amended Motions to Set Aside the Verdict, at 23-27.

there was some type of a deal," alluded to "somewhat of a Mary Carter,"[3] and said that if "the Court saw this questioning by the plaintiffs, going through what you did, if the Court did not think that looked fishy, then — and I will say this. I just wanted the Court to know I did not say that for grins, I apologize to the court. I just wanted to explain because I thought that was bias."

When proceedings resumed after lunch, the plaintiffs moved to nonsuit their claims against Orvil and Roberta Reedy, leaving MTD as the sole defendant. MTD acknowledged that the court was required to grant the motion, which the court did.

Plaintiffs' attorney, in making the nonsuit motion, referred to discussions about possible settlement with Mr. and Mrs. Reedy. Considering the contretemps before the luncheon recess, I invited MTD to consider whether it now wanted to move for continuance or mistrial. MTD was represented by highly-qualified, experienced, extraordinarily able counsel, and prudence should have dictated waiting to see whether any motions or requests would be forthcoming. MTD moved for a mistrial. The court, reaping what it had sowed, took the motion under advisement "in contemplation of being able to look at the end of the case at whether manifest injustice [ . . .] being able to look retrospectively and to consider such arguments as you might want to make at that point [—] which I know probably comes as a great shock to everyone." Trial transcript at 787, ll. 3-11. The motion was renewed after the verdict was returned and has remained under advisement.

"[U]nder Code § 8.01-380, a plaintiff has an absolute right to one nonsuit. The election is his and if he insists upon taking the nonsuit within the limitations imposed by the statute neither the trial court nor opposing counsel can prevent him from doing so." *Nash v. Jewell*, 227 Va. 230, 237, 315 S.E.2d 825 (1984).

---

[3] According to *Black's Law Dictionary* (7th ed. 1999) 989, a " 'Mary Carter Agreement' is a contract, usually a secret one, by which one or more, but not all codefendants settle with the plaintiff and obtain a release, along with a provision granting them a portion of any recovery from the nonparticipating codefendants. In a Mary Carter agreement, the participating codefendants agree to remain parties to the lawsuit and, if no recovery is awarded against the nonparticipating codefendants, to pay the plaintiff a settled amount. Such an agreement is void as against public policy in some states but is valid in others if disclosed to the jury. *Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. Dist. Ct. App. 1967). In its Amended Motions to Set Aside the Verdict, MTD says, at 23, that the concept of "Mary Carter agreements" is "apparently unheard of in the jurisprudence of Virginia."

As plaintiffs' counsel pointed out at the time, the co-administrators had the prerogative to take this "nonsuit of right" against the Reedys at any time "before a motion to strike the evidence [was] sustained or before the jury retire[d] from the bar or before the action [was] submitted to the court for decision." Va. Code § 8.01-380; see *Ford Motor Co. v. Jones*, 266 Va. 404, 406, 587 S.E.2d 579 (2003). This court would have been forbidden to "place limitations on the absolute right of the plaintiff to seek the nonsuit beyond those found in the statute." *Janvier v. Arminio*, 272 Va. 353, 365, 634 S.E.2d 754 (2006); *see Willard v. Moneta Bldg. Supply, Inc.*, 262 Va. 473, 480, 551 S.E.2d 596 (2001) ("[t]he privilege and capacity to exercise a right, though unexercised, is a thing of value — is property — of which one cannot be despoiled.") The parties have not called to my attention, nor have I discovered, any reported Virginia decision in which a defendant moved for, or was granted, a mistrial because the plaintiff nonsuited another defendant. *Cf. City of South Boston v. Halifax County*, 247 Va. 277, 284, 441 S.E.2d 11 (1994) (statutory right cannot be burdened unless legislature creates burden when it creates right). N.B. There has at no time been any suggestion that MTD was forced to go to trial over its protest. *See Virginia Elec. & Power Co. v. Jayne*, 151 Va. 694, 702, 144 S.E. 638 (1928).

Since the plaintiffs had the unchallenged right to nonsuit the Reedys, it is unfortunate that the record is cluttered with irrelevant mentions of settlement discussions and of the straw man of "Mary Carter Agreements."

There is no prohibition against the tactical use of the nonsuit motion. Had the Reedys remained defendants, there would have been a substantial likelihood of the plaintiffs' receiving a verdict against them. The plaintiffs and the Reedys had a common economic interest. MTD's lead trial attorney, in making his mistrial motion, stated, without being contradicted, that the Reedys had $100,000 in available insurance coverage, all of which had long ago been offered to the plaintiffs. It is self-evident that neither the plaintiffs nor the Reedys wished to see the plaintiffs recover only from the Reedys — with their $100,000 policy limits — and then try to collect the balance of a full and fair verdict by creditor's bill or in bankruptcy. At oral argument on post-trial motions, MTD's lawyer conceded that MTD was the "deep pocket" defendant. The plaintiffs were entitled to make the tactical decisions that would maximize the likelihood of recovery from that solvent defendant. They were entitled to follow Mark Twain's adage: "Put all your eggs in the one basket and — WATCH THAT BASKET."

III. *Whether a verdict that MTD was legally responsible for Justin's death must be set aside as contrary to the law and the evidence?*

A. *The Scope of the Judge's Authority*

Article I, § 11, of the Constitution of Virginia proclaims:

That in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred.

Concomitantly, "[t]he circuit court's authority to set aside a jury verdict is limited and should be exercised 'only if a jury verdict is plainly wrong or without credible evidence to support it.' If the evidence adduced at trial is conflicting on a material point, or if reasonable persons may draw different conclusions from the evidence, or if a conclusion is dependent on the weight the fact finder gives to the evidence, a judge may not substitute his or her conclusion for that of the jury merely because he or she would have reached a different result."*Estate of Moses v. Southwestern Va. Transit Mgmt. Co.*, 273 Va. 672, 677, 643 S.E.2d 156 (2007) (citations omitted).

When a jury returns its verdict, the prevailing parties are entitled to receive the benefit of all reasonable inferences that might be drawn from the evidence; to have all substantial conflicts in the evidence resolved in their favor; and to have the facts recited with these principles in mind. *See Bitar v. Rahman*, 272 Va. 130, 137, 630 S.E.2d (2006); *Rappahannock Pistol & Rifle Club*, 262 Va. at 7-8; *Stover v. Norfolk & W. Ry.*, 249 Va. 192, 194, 455 S.E.2d 238, *cert. denied*, 516 U.S. 868 (1995).

When asked to set aside a jury's verdict, the trial court "as a preliminary to its interposition, must be satisfied that a clear and palpable error has been committed by the jury." *Hill v. Commonwealth*, 43 Va. (2 Gratt.) 594, 617 (1845); *see Bitar, id.*; *Rappahannock Pistol & Rifle Club*, 262 Va. 5, 7-8, 546 S.E.2d 440 (2001); *Stover v. Norfolk & W. Ry., id.* It must review all of the evidence presented at trial, and "place itself in the jury's shoes. It must see what the jury saw so that it can decide whether any credible evidence exists to support the jury's verdict." *Graves Construction*, 226 Va. at 169. If any credible evidence in the record supports the jury verdict, judgment must be entered on the verdict.

*The Law of the Case*

"Instructions given without objection become the law of the case and thereby bind the parties in the trial court and [the Supreme] Court on review." *Ulloa v. QSP, Inc.*, 271 Va. 72, 80, 624 S.E.2d 43 (2006). All of the instructions in this case were given without objection (the court articulating for the defendant an objection to the fact that the court was giving instructions at all, instead of striking the evidence). Arguments based on theories not encompassed in the law of the case are, as it were, "out of bounds." I therefore do not discuss some of the theory, and Virginia and Fourth Circuit products liability cases, referred to in MTD's memoranda.

These three instructions, given without objection, are particularly relevant to the discussion that follows:

> Instruction No. 6: The law does not impose upon the manufacturer of a product the duty to design and market an accident-proof product. The law imposes upon the manufacturer the duty to exercise ordinary care to design and market a product which is reasonably safe:
>
> (a) for the purposes for which it is intended; and
>
> (b) for other uses to which it ordinarily would be put; and
>
> (c) for other uses that the manufacturer reasonably could foresee.
>
> Violation of this duty is negligence.
>
> Instruction No. 9: A "warranty" is a promise or guarantee that a product is of a certain quality or character. When a company manufactures and sells a product, it gives an implied warranty — a warranty that the law imposes — that the product:
>
> (a) will be fit for the purposes for which such a product ordinarily is used; and
>
> (b) will be fit for any other reasonably foreseeable use.
>
> If you find that the plaintiffs have proved, by the greater weight of the evidence, that the lawn tractor, as designed and sold, was unreasonably dangerous either for the use to which it would ordinarily be put or for some other reasonably foreseeable use, then defendant MTD Products, Inc., violated, or breached, its implied warranty of fitness.

Instruction No. 12: If you find by the greater weight of the evidence that defendant MTD Products, Inc.:

 (a) was negligent, or

 (b) breached its implied warranty, or

 (c) was negligent and breached its implied warranty; and

 If you further find by the greater weight of the evidence that MTD's negligence, or breach of warranty, or both, was a proximate cause of Justin Simmons's injuries and death, then you shall find your verdict in favor of the plaintiffs.

 If you find that the plaintiffs have failed to prove either (a) that MTD was negligent, or (b) that MTD breached its implied warranty, you must find your verdict for the defendant.

 Similarly, even if you find that MTD was negligent or breached its implied warranty, but you find that the plaintiffs have failed to prove by the greater weight of the evidence that MTD's negligence or breach of warranty was a proximate cause of Justin Simmons's injuries and death, you must find your verdict for the defendant.

 If, under the provisions of this instruction, you find your verdict for the plaintiffs, then you must not concern yourselves with whether or not negligence of Mr. and Mrs. Reedy, or either of them, also was a proximate cause of Justin Simmons's injuries and death.

*Evidence Concerning Product Defect*

 Dr. Jeffery Warren, one of the plaintiffs' expert witnesses, holds a Ph.D. in mechanical engineering from Virginia Polytechnic Institute & State University. His undergraduate and master's degrees also were in mechanical engineering. All of his degrees have an emphasis on machine design. He is licensed as a professional engineer in about a dozen states, including Virginia, and characterizes himself as a "consulting mechanical engineer" and a "forensic engineer." He also is a "Certified Safety Professional," "a person [who] identifies hazards and assesses risks and works on implementation of safety through design." He has been a member of the National Safety Council's Institute for Safety through Design.

 Dr. Warren testified that forensic engineering is that branch of engineering "where you are typically looking at claims and accidents that may end up in the courts." At the time of trial, he had been engaged in such work

for nineteen years, and had investigated more than 1,500 incidents, claims, or accidents involving machinery and equipment.

Dr. Warren, who has specialized in the area of machine safeguarding, is the author of approximately twenty publications, some of which relate to "safety through design," and has given presentations to professional engineers about safety through design. He has never designed a lawn mower, but has dealt with lawn mowers "a couple of times" in his forensic engineering work. He testified before the jury — which was entitled to accept or reject this statement — that "this is just another machine that needs to be looked at from a safeguarding point of view and that's what I'm here to talk about today." His work history includes academia and private enterprise. When this mower was manufactured, Dr. Warren was a practicing mechanical engineer.

Dr. Warren performed an engineering analysis "to determine whether the MTD mower that backed over and killed Justin Simmons was reasonably safe for its intended use and foreseeable misuse." He testified that he conducted a safety design analysis investigation of the hazards, risks, and safety engineering alternatives; inspected and analyzed the lawn mower involved in this case; and reviewed the depositions and other discovery documents, including the depositions of the Reedys, of the first law-enforcement on the scene, and of Gunter F. Plamper. Mr. Plamper, MTD's chief engineer and vice president of development and safety, was its "corporate representative" in the courtroom throughout the trial. He also was MTD's expert witness. He and his team designed the model of mower involved in this case.

Mr. Plamper also inspected the mower whose blades killed Justin. Both Dr. Warren and Mr. Plamper demonstrated thorough knowledge about the specific lawn tractor, the state of the art when the lawn tractor was manufactured and sold, and the safety concerns of mower manufacturers in 1988, when this mower was manufactured.

Dr. Warren testified, without objection or contradiction, that a design engineer must take into consideration "the operation of the machine," "what the operator is likely to do," and known hazards involved in the machine's operation.

Both Dr. Warren and Mr. Plamper testified about a University of Iowa study, published in 1972, dealing with "backover" and "rollover" hazards. Relying on the Iowa study and on Mr. Plamper's deposition testimony, Dr. Warren testified that small children are a concern in safe design of riding mowers because they are intrigued by machinery and equipment; "they have a tendency to chase after mowers"; and they are difficult to see.

Through the testimony of both Dr. Warren and Mr. Plamper, the jury knew that, when this mower was manufactured, MTD had addressed the hazard of child-backover injuries on flat ground by its "no mow in reverse" feature, which disengaged the blades when the mower was placed in reverse gear. (Dr. Warren testified that this innovation solved the flat-ground rollover problem.)

From both Mr. Plamper and Dr. Warren, the jury heard that MTD was aware, at the time the mower was manufactured, that an operator could back or roll the mower down an incline, with the blades still engaged and running, by placing it in neutral, or by fully engaging the clutch.

Dr. Warren testified, without contradiction, that the hazard to be addressed was "child rollover, runover hazard, or backover hazard when being operated in reverse on a hill, on an incline where ultimately the mower ends up on top of the child and the rotating blade causes an amputation or death." Dr. Warren testified that this was a "known, specific hazard associated with this machine," and that MTD did not address this hazard in any way. He testified that, at the time that this lawn tractor was manufactured, technology existed, and was economically available to (a) detect rearward motion, and (b) then engage a brake that would (c) stop the spinning blades within a second or two. He testified — making reference to Mr. Reedy's statement to law-enforcement officers that the incident happened "in seconds" — that if this known hazard had been addressed by a blade brake, the blades would have stopped "in a couple of seconds," and Justin would not have been killed.

As the plaintiffs note in their brief, this testimony was before the jury without objection. The jurors had been instructed, also without objection, that they were the judges of the facts, the credibility of the witnesses, and the weight of the evidence. (Instruction No. 2.)

Also before the jury without objection was Dr. Warren's testimony that a mower designer must take into account the fact that people tend to do what is simplest or easiest. There were two ways to use the Reedy garden tractor to mow while on an incline, he testified. One, using the "dead zone" on the brake/clutch pedal, required two steps to perform, and allowed the operator to cut grass while coasting downhill with the blades spinning. The other involved many steps, including shifting into reverse, which automatically turned off and lifted the blades; shifting into a forward gear to resume mowing, and finally, mowing forward in a forward gear. Mr. Plamper agreed with the assessment that people tend to do the simplest or easiest things. He also agreed that the components Dr. Warren described were available in 1988, when the lawn tractor was manufactured.

Mr. Plamper indicated skepticism about the practical efficacy of what Dr. Warren described. Dr. Warren, obviously, had no such skepticism. Of such disputes are jury issues made.

The same thing is true of two other things MTD discusses — the existence of working models of alternative designs, and industry and government standards. "The law of the case" allows the jury to give these things such weight and value as the jurors think they are entitled to.

### Prototypes

The jurisprudence of Virginia has never required that a plaintiff in a case of this sort prove the existence, at the time the machine complained about was manufactured, of a working example or prototype of the alternative design. The jurisdictions that require such evidence are states in which "strict liability" applies. *See, e.g., Lease v. International Harvester Co.*, 529 N.E.2d 57 (Ill. 1988); *General Motors Corp. v. Edwards*, 482 So. 2d 1176 (Ala. 1985); *Berker v. Lull Engineering*, 573 P.2d 443 (Cal. 1978). "[S]trict liability [is] a doctrine that is not recognized in Virginia." *Harris v. T.I., Inc.*, 243 Va. 63, 71, 413 S.E.2d 605 (1992); *but see Philip Morris, Inc. v. Emerson*, 235 Va. 380, 406, 368 S.E.2d 268 (1988) (strict liability applies in blasting cases).

### Industry and Government Standards and Trade Usage

In its memoranda and oral argument, MTD emphasizes, as it did before the jury, that no industry or government standards required (or even suggested) the sort of design that the plaintiffs contend was necessary and that, neither in 1988 nor by the time of trial have any other manufacturers implemented such a design for riding mowers of comparable size.

These things, MTD argues, weigh heavily against the plaintiffs. Some courts suggest that, in products liability cases, "one of the most significant factors is whether others in the field are using the same design, or a safer design." *Garst v. General Motors Corp.*, 484 P.2d 47, 61 (Kan. 1971). Others consider factors such as known feasibility and adequate testing. *Id.* (citing *Watts v. Bacon & Van Buskirk*, 163 N.E.2d 425 (Ill. 1959); *Amason v. Ford Motor Co.*, 80 F.2d 265 (5th Cir. 1935)).

But it would be a rare court, in an extraordinary case, that would accept "no one else does it" as conclusively establishing lack of duty. "What usually is done," Justice Holmes wrote, more than a century ago, "may be evidence of what ought to be done, but what ought to be done is fixed by a standard of

reasonable prudence, whether it usually is complied with or not." *Texas & Pacific Ry. v. Behymer*, 189 U.S. 468, 470 (1903) (Holmes, J.) (cited in *Garst, supra*, and applied in *Atchison, Topeka & Santa Fe Ry. v. Parr*, 391 P.2d 575, 578 (1964)).

Judge Learned Hand expressed a similar thought when the question was whether tugboats should be equipped with radios:

> Is it then a final answer that the business had not yet generally adopted receiving sets? . . . Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It may never set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

*The T. J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932), *cert. denied sub nom. Eastern Transportation Co. v. Northern Barge Corp.*, 287 U.S. 662 (1932).

Courts deciding products liability cases have often quoted Judge Hand's words, even though they were written in a different kind of case. *See, e.g., George v. Celotex Corp.*, 914 F.2d 26 (2d Cir. 1990) (compliance with industry standard no shield from liability for asbestos-related injuries); *Foster v. Caterpillar Tractor Co.*, 714 F.2d 654 (6th Cir. 1983) (defective tractor); *Spinosa v. International Harvester Co.*, 621 F.2d 1154 (1st Cir. 1980) (same). The instructions in the case at bar of course focus on reasonable prudence ("ordinary care") as the standard, not trade practices.

An argument that trade practices should dictate the "standard of care" is essentially an argument that product manufacturers should be treated like doctors, lawyers, and other professionals. *See Rossell v. Volkswagen*, 709 P.2d 517, 523 (Ariz. 1985). The Supreme Court of Virginia is unlikely to adopt such a position. As the Arizona Supreme Court stated, trades "will be allowed to create their own standards of reasonably prudent conduct only when the nature of the group and its special relationship with its clients assure society that those standards will be set with primary regard to protection of the public rather than to such considerations as increased profitability." *Id.*

The weight given to evidence of trade practices is closely related to that of experimentation evidence.

## Testing and Experimentation

"Settled evidentiary principles" require expert testimony to rest upon "a bedrock of fact" — facts within the expert's own knowledge or established by other evidence in the case. Mere inferences founded upon inferences "possess no evidential value." *Stover*, 249 Va. at 200. *See Countryside Corp. v. Taylor*, 263 Va. 549, 552, 561 S.E.2d 680 (2002). Without a prototype of an alternative design, without evidence that anyone has constructed a riding mower with the safety features that Dr. Warren says are necessary, can the court say that the foundation of his opinion is anything more than mere conjecture? *Stover, id.*

In the jurisprudence of this state, it is for the jury, not the judge, to decide what weight or effect to give to the presence or absence of experimental designs and prototypes when, as here, an expert's statements of fact and opinion are before the jury without objection. See D. Arthur Kelsey, "Virginia's Answer to Daubert's Question Behind the Question," 90 Judicature No. 2, Sept.–Oct. 2006, at 68, *passim*.

When the admission of evidence is contested, nothing compels a trial judge to (quoting Chief Justice Rehnquist) "admit opinion evidence which is connected to existing data only by the *ipse dixit* (he himself said it) of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1977). The admission of opinion testimony may be contested by objection, made when the testimony is offered or, if a "defect in an expert witness' testimony [is] not apparent until the testimony of that witness is completed," at the first opportunity. *Bitar v. Rahman*, 272 Va. 130, 140, 630 Va. 319 (2006). If evidence has not been challenged by the time the case goes to the jury, however — no objection has been made, no limiting or cautionary instruction has been sought — then it is for the jury to determine the weight, effect, nature, and quality of that evidence. *TransiLift Equipment, Ltd. v. Cunningham*, 234 Va. 84, 92 , 360 S.E.2d 183(1987). A party who could have objected, but chose to not do so, cannot be heard to complain that the jury has followed the court's instructions and considered all of the evidence. *Bitar*, 272 Va. at 140.

Further, when a witness's testimony combines statements of opinion and assertions of fact, as Dr. Warren's does, the cross-examiner has the right, under Virginia Code § 8.01-401.1, to require the witness to furnish specifics about the "underlying facts or data" upon which he relied. The cross-examiner probed in this area as far as he chose to go. He cannot now ask the court to conclude that, if he had asked more questions, weaknesses in the plaintiffs' case would have been exposed.

The trial judge has neither right nor prerogative to inquire into the validity of evidence that is before the jury without objection and is before the jury through witnesses whom the defendant has cross-examined.

Having reviewed the evidence to the extent of determining that, through Dr. Warren, the plaintiffs adduced credible evidence that supports the jury's verdict, I need go no farther. *See T. M. Graves*, 226 Va. at 169. I must enter judgment on the jury's verdict.

It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. *Tennant v. Peoria & P. U. RR.*, 321 U.S. 29, 35 (1932) (Murphy, J.); *see Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 485 (1933) (Brandeis, J.) ("Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct."); *Union P. RR. v. Hadley*, 246 U.S. 330, 334 (1918) (Holmes, J.) (since jury's "finding was possible on the evidence it cannot be attributed to disregard of duty," and reviewing court therefore cannot be concerned with whether jury's reasons for decision were right or wrong).

### The Most Favored Position Known to the Law

In *Tri-State Coach Corp. v. Walsh*, an opinion issued on September 8, 1948, Justice Willis D. Miller coined a phrase. *Tri-State Coach Corp. v. Walsh*, 188 Va. 299, 49 S.E.2d 363 (1948). When a trial judge has entered judgment on a jury's verdict, Justice Miller wrote, the party for whom the jury found "occupies the most favored position known to the law." *Id.*, 188 Va. at 303-04. The words "the most favored position known to the law" have the solemnity and solidity that suggest a heritage extending to a time long before the settlement at Jamestown. It appears, however, that, before *Tri-State Coach*,

no published judicial decision in the history of the United States and their predecessor colonies had — in any context — used this phrase. In making that statement, I rely on the completeness of a computer data base. LEXIS search, last conducted February 22, 2008. *Tri-State Coach* cited *Neal v. Spencer*, 181 Va. 668, 26 S.E.2d 70 (1943), which used the words "strongest position known to the law." *Id.* at 676. The "strongest position" language originated with *Oney v. Jamison*, 175 Va. 420, 422, 9 S.E.2d 346 (1940) and was used in five cases, all in the 1940's. The LEXIS database contains English reported cases from 1558, tax cases from 1875, and unreported cases from 1980 — but no cases containing these words. In the sixty years since *Tri-State Coach*, Justice Miller's formulation has found acceptance outside of Virginia only in three mid-1970's opinions (one a dissent) written by two judges of New Mexico's intermediate appellate court. *Curtiss v. Aetna Life Ins. Co.*, 560 P.2d 169 (N.M. App. 1976) (citing *Hooker v. Hancock*, 188 Va. 345, 49 S.E.2d 711 (1948); *Martinez v. Knowlton*, 536 P.2d 1098 (N.M. App. 1975); see also *Luera v. City of Deming*, No. 4961, 1981 N.M. App. LEXIS 8323. During those sixty years, however, Justices of the Supreme Court of Virginia have issued twenty-two more opinions stating that a party armed with a jury's verdict approved by the trial court occupies "the most favored position known to the law." *See Banks v. Mario Indus.*, 274 Va. 438, 450, 650 S.E.2d 687 (2007), the most recent Supreme Court decision to employ this language. This concept surely *appears* to be, as the Court said in *Bitar v. Rahman*, 272 Va. at 137, a well-established principle of appellate review in Virginia.

(Although sixty years have passed since *Tri Star Coach*, it is, in a sense, almost contemporary. Justice Miller was succeeded on the bench of the Supreme Court of Virginia by a Justice who continues to sit on that Court, now as a Senior Justice, Harry Lee Carrico. See Memorial to Justice Willis Dance Miller, 202 Va. cliii (April 17, 1961), and title page of Vol. 202 of the Virginia Reports.)

Nonetheless, I respectfully disavow any intention to place any sort of judicial imprimatur on the jury's decision in this case. With greatest respect, I suggest that the statement that approval by the trial judge elevates a jury's decision "to the most favored position known to the law" is a rhetorical flourish. It is simply another way of saying that those armed with a jury verdict in their favor are entitled to have the evidence viewed in the light most favorable to them, and to have the benefit of all inferences reasonably drawn from the evidence — together with a modicum of appellate respect for the trial court's "diligence or perspicacity in appraising the jury's conduct." *Fairmount Glass*, 297 U.S. 474.

Strictly speaking, then, it is *obiter dictum* — a judicial comment not necessary to the decision in the cases in which it was made. *See Waller v. Long*, 20 Va. (6 Munf.) 71, 76 (1818); *Black's Law Dictionary* (7th ed. 1999) 1100; *see also McAmis v. Commonwealth*, 225 Va. 419, 421-22, 304 S.E.2d 2 (1983) (contains passage in which Supreme Court converts previous *dictum* into *ratio decidendi*.) For if it is not *dictum* — if, indeed, a trial judge who confirms a jury's verdict *is* considered to be placing his or her imprimatur on the verdict, then there is an additional step in the trial judge's analysis of whether to set aside or confirm a verdict, a discretionary step not mentioned in the entire body of Virginia decisions addressing the limits on a judge's power to set aside a jury's verdict. This section of this opinion is, of course, pure *obiter dictum*

## Conclusion

For the reasons set forth above, the court will enter judgment on the jury's verdict in the amount of $2 million, with interest from the date of Justin Simmons's death, and taxable costs. The judgment will be allocated in accordance with the verdict of the jury.